# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE_____ AUG 0 1 2013

_for_ CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on Aug 1, 2013

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 86257-5 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| KIRK RICARDO SAINTCALLE, | ) | |
| | ) | Filed _____ AUG 0 1 2013 _____. |
| Petitioner. | ) | |
| | ) | |

WIGGINS, J.—This appeal raises important questions about race discrimination in our criminal justice system. Kirk Saintcalle, a black man, challenges his conviction for first degree felony murder because the State used a peremptory challenge to strike the only black venireperson in his jury pool. Saintcalle claims the peremptory strike was clearly racially motivated in violation of the equal protection guaranty enshrined in _Batson v. Kentucky_, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We disagree. _Batson_ requires a finding of purposeful discrimination, and the trial court's finding that there was no purposeful discrimination here is not clearly erroneous. Accordingly, we affirm Saintcalle's conviction.

However, we also take this opportunity to examine whether our _Batson_ procedures are robust enough to effectively combat race discrimination in the selection of juries. We conclude that they are not. Twenty-six years after _Batson_,

1

a growing body of evidence shows that racial discrimination remains rampant in jury selection. In part, this is because *Batson* recognizes only "purposeful discrimination," whereas racism is often unintentional, institutional, or unconscious. We conclude that our *Batson* procedures must change and that we must strengthen *Batson* to recognize these more prevalent forms of discrimination.

But we will not create a new standard in this case because the issue has not been raised, briefed, or argued, and indeed, the parties are not seeking to advance a new standard. Applying *Batson*, we affirm the Court of Appeals.

## FACTS

Kirk Saintcalle was convicted of one count of first degree felony murder and three counts of second degree assault, all with firearm enhancements. Saintcalle was accused of entering an apartment in the city of Auburn with two companions, holding three people at gunpoint, and shooting and killing Anthony Johnson. Saintcalle was sentenced to 579 months in prison.

During jury selection at Saintcalle's trial, the prosecution used a peremptory challenge to strike the only black juror in the venire, juror 34, Anna Tolson. This challenge came after the prosecution questioned juror 34 extensively during voir dire—far more extensively than any other juror. Indeed, most of the prosecution's interactions with jurors were quite brief, usually consisting of only a few short questions, but not the interaction with juror 34. The State began questioning juror 34 after another juror made a comment about race:

2

[JUROR 72]: I feel there are some areas of unfairness in our system. I am aware, for example, that a jury of their peers [sic], yet as you look around this panel, all of the faces are white.

[JUROR 34]: No, not quite.

(Laughter.)

[PROSECUTOR]: You know what, you kind of bring a very important topic to light. If you were seated here in this chair and you looked out at this panel, would you have any concern about whether or not people are going to be able to relate to you or listen to you or feel for you? Juror number—What is your number? Juror number 34, I am going to ask you a little bit about your background. You work at the YMCA?

[JUROR 34]: I work in a middle school.

[PROSECUTOR]: So tell me how that works. So you are a counselor?

[JUROR 34]: Yes.

[PROSECUTOR]: Which means you see a whole lot.

[JUROR 34]: Yes.

[PROSECUTOR]: And where do you work? What school do you work in?

[JUROR 34]: Do I really need to say that?

[PROSECUTOR]: How about you just tell me the city. Is it an inner city school?

[JUROR 34]: Yes.

[PROSECUTOR]: You see a whole lot?

[JUROR 34]: Yes.

[PROSECUTOR]: I am interested to hear from you—I mean, do you have impressions about the criminal justice system?

[JUROR 34]: Yes.

[PROSECUTOR]: You are not going to hurt my feelings if you talk about them a little bit. What are your thoughts?

3

[JUROR 34]: Gosh, I feel like I am on the spot here.

But being a person of color, I have a lot of thoughts about the criminal system. I see—I have seen firsthand—and a couple people have already mentioned that if you have money, you tend to seem to work the system and get over. And regardless if you are innocent or guilty, if you want to be innocent, your money says you are innocent.

And a person of color, even if you do have an affluent lawyer who has the background, the finance to get you off, because you are a person of color, a lot of times you are not going to get that same kind of opportunities.

And especially with this person being a person of color and being a male, I am concerned about, you know, the different stereotypes. Even if we haven't heard anything about this case, we watch the news every night. We see how people of color, especially young men, are portrayed in the news. We never hardly ever see anyone of color doing something positive, doing something good in their community.

So kind of like what the person behind me is saying, since most of the people in this room are white, I am wondering what's running through their mind as they see this young man sitting up here.

[PROSECUTOR]: Right. How about for you, do you think—I mean, you've got a whole lot that you are feeling as you sit here and that you are going to be asked to sit in judgment of somebody. How do you think you are going to be able to handle that?

[JUROR 34]: I think number one, because I am a Christian, I know I can listen to the facts and, you know, follow the judge's instruction. But also it's kind of hard, and I haven't mentioned this before because none of those questions have come up for me to answer, but I lost a friend two weeks ago to a murder, so it's kind of difficult sitting here. Even though I don't know the facts of this particular case, and I would like to think that I can be fair because I am a Christian, I did lose someone two weeks ago.

[PROSECUTOR]: Was that in Seattle?

[JUROR 34]: Yes.

[PROSECUTOR]: Was that [the] Tyrone case?

[JUROR 34]: Yes.

4

Report of Proceedings (RP) (Mar. 9, 2009) at 65-68. After a stretch break, the prosecutor resumed questioning juror 34:

> [PROSECUTOR]: Juror number 34, I am going to move on to the group, but I wanted to close the loop with you. You have a lot that is going through your mind currently both that would give you a lot of empathy for someone who is charged with a crime and also empathy for someone who may be a victim of a crime. In that way, you may be representative of the perfect juror.
>
> At the same time, we don't put people in a position where it's going to cause them a lot of emotional pain. At this point do you think you could sit in this case and listen to the facts and make a decision based solely on the evidence presented in trial here and be fair to both sides?
>
> [JUROR 34]: I'd like to think that I could be, but kind of what you just mentioned just with the freshness and the rawness of the death of a friend, I am wondering if that would kind of go through my mind. I like to think that I am fair and can listen, be impartial, but I don't know. I have never been on a murder trial and have just lost a friend two weeks prior to a murder.
>
> [PROSECUTOR]: What I am going to do, I am going to ask questions. I am going to kind of move on to the rest of the group so that you have time to think, and then we'll come back and ask you maybe tomorrow to make your final decision about whether or not you think you can be fair. I am sorry for your loss.

*Id.* at 69-70. The next day, a different deputy prosecuting attorney followed up with juror 34:

> [PROSECUTOR]: Go back to [a] couple [of] people juror number 34 sorry [to] focus on you again after yesterday but I just want to try and go back [and] touch base with you. I know[ ] you mentioned yesterday that you had some recent events in your life that may make it difficult for you to serve as jurors [sic] in [this case]. Have you done anymore thinking about that? How are you feeling today?
>
> [JUROR 34]: Yes. I thought about it last night as well as this morning. And, you know, my thought is I don't want to be a part of this jury because of the situations, and the circumstances that I just went through. But I'm thinking if ever I was put in a situation where I needed twelve people who could be honest and look through all the facts or I

guess I'm saying who could be like me I would want me. So sometimes you have to do things that you don't want to do.

[PROSECUTOR]: I guess my only concern is do you feel like maybe some of the emotions that dredge up could cloud your judgment at all on either side. Either you know against the defendant, against the State or I'm just concerned about that particular issue?

[Court inquires whether juror 34 would like to answer the question in private, but juror 34 declines.]

[PROSECUTOR]: So is that something you can set aside or worried at all about the emotions kind of clouding in? I mean, it's just so new in terms of your life?

[JUROR 34]: I mean, I have never been in this situation where I have lost someone. You just went to the funeral. He is young. Only 24. And to be called to jury duty to perhaps be on a jury of a murder suspect. I don't know how I'm going to react. You know, I don't know. I'm—I'm not an emotional person, but I'm thinking as we go through it, and I hear the testimony, and I see the pictures, I don't know. I mean, I'm just being honest. I don't know how I'm going to feel.

RP (Mar. 10, 2009) at 41-43.

After this exchange, the prosecution challenged juror 34 for cause. The judge denied the challenge, and the prosecution announced its intent to exercise a peremptory strike. At that point, Saintcalle raised a *Batson* challenge.

As required by *Batson*, the judge first found that Saintcalle had made a prima facie showing of purposeful discrimination. Next, the prosecution presented race-neutral reasons for striking juror 34: the reasons were (1) juror 34's "inattention" during voir dire and (2) the recent death of juror 34's friend. *Id.* at 101-02. The prosecutor claimed to have spent "a lot of time watching juror 34" and asserted that juror 34 was "very checked out." *Id.* at 101.

The judge denied the *Batson* challenge, stating on the record that he accepted the recent death of juror 34's friend as a proper race-neutral reason for

6

the strike. Near the end of jury selection, the prosecution peremptorily struck juror 34, excusing her from the jury.

The prosecution also attempted to exercise a peremptory against the sole Mexican-American juror in the venire, juror 10, but the judge sustained Saintcalle's *Batson* challenge to that strike, rejecting each of the prosecutor's proffered reasons as pretextual. *Id.* at 119-20.

After Saintcalle was convicted, he appealed, alleging that the peremptory strike of juror 34 (Ms. Tolson) violated the Fourteenth Amendment's guaranty of equal protection. The Court of Appeals rejected his argument finding there was no purposeful discrimination and accepting the State's race-neutral explanation. *State v. Saintcalle*, noted at 162 Wn. App. 1028, 2011 WL 2520000 (2011). We granted review only on the *Batson* issue. *State v. Saintcalle*, 172 Wn.2d 1020, 268 P.3d 224 (2011).

## STANDARD OF REVIEW

We review *Batson* challenges for clear error, deferring to the trial court to the extent that its rulings are factual. *State v. Hicks*, 163 Wn.2d 477, 486, 181 P.3d 831 (2008) (citing *State v. Luvene*, 127 Wn.2d 690, 699, 699, 903 P.2d 960 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 364, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991))). Clear error exists when the court is left with a definite and firm conviction that a mistake has been committed. *E.g., Ass'n of Rural Residents v. Kitsap County*, 141 Wn.2d 185, 196, 4 P.3d 115 (2000).

ANALYSIS

Race discrimination in courtrooms "raises serious questions as to the fairness of the proceedings conducted there." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991). Discrimination "mars the integrity of the judicial system and prevents the idea of a democratic government from becoming a reality." *Id.*

It is crucial that we have meaningful and effective procedures for identifying racially motivated juror challenges because "[r]acial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try"; it also shamefully belittles minority jurors who report to serve their civic duty only to be turned away on account of their race. *Batson*, 476 U.S. at 87. Perhaps most damaging, racial discrimination "undermine[s] public confidence in the fairness of our system of justice."[1] *Id.* at 87-88. Racial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts, and permitting such exclusion in an official forum compounds the racial insult inherent in judging a citizen by the color of his or her skin. *Edmonson*, 500 U.S at 628.

---

[1] A recent report by Washington's Race and Equal Justice Task Force notes that "'bias pervades the entire legal system in general and hence [minorities] do not trust the court system to resolve their disputes or administer justice even-handedly.'" TASK FORCE ON RACE AND THE CRIMINAL JUSTICE SYSTEM, PRELIMINARY REPORT ON RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM at 6 (2011) (alteration in original), *available at* http://www.law.washington.edu/About/RaceTaskForce/preliminary_report_race_criminal_justice_030111.pdf (quoting WASH. ST. MINORITY & JUSTICE COMM'N, 1990 FINAL REPORT at xxi (1990), *available at* http://www.courts.wa.gov/committee/pdf/TaskForce.pdf).

*Batson* sets forth a three-part analysis for determining whether a peremptory strike unconstitutionally discriminates based on race. First, the person challenging the peremptory must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."[2] *Batson*, 476 U.S. at 93-94. Second, "the burden shifts to the State to come forward with a [race-]neutral explanation" for the challenge. *Id.* at 97. Third, "the trial court then [has] the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98. If the trial court finds purposeful discrimination, the challenge should be granted and the peremptory strike disallowed.

As part of the "purposeful discrimination" analysis, the Supreme Court has established a comparative juror analysis. This entails examining whether the proffered race-neutral explanation could apply just as well to a nonminority juror who was allowed to serve. *Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005). A corollary is that disparate questioning of minority jurors can provide evidence of discriminatory purpose because it creates an appearance that an attorney is "fishing" for a race-neutral reason to exercise a

---

[2] The State argued for the first time in its supplemental brief that we should repudiate the bright line rule approved by a majority of this court that "a defendant establishes a prima facie case of discrimination when . . . the record shows that the State exercised a peremptory challenge against the sole remaining venire member of the defendant's constitutionally cognizable racial group." *State v. Rhone*, 168 Wn.2d 645, 659, 229 P.3d 752 (2010) (Alexander, J., dissenting) *Rhone* was a split decision, with a four-justice lead opinion rejecting the proposed bright line rule, a four-justice dissent supporting it, and Chief Justice Madsen concurring stating that "I agree with the lead opinion in this case. However, going forward, I agree with the rule advocated by the dissent." *Id.* at 658 (Madsen, C.J., concurring). We grant Saintcalle's motion to strike the issue because any statement about the *Rhone* bright line rule would be dictum in this case and because the State failed to raise the issue in a timely manner. RAP 13.4(d).

strike. *Id.* at 244-45; *Reed v. Quarterman*, 555 F.3d 364, 379 (5th Cir. 2009). We do not allow prosecutors to go fishing for race-neutral reasons and then hide behind the legitimate reasons they do find. This disproportionately affects minorities.

Similarly, a proffer of pretextual reasons gives rise to an inference of race discrimination, and a court's finding of discrimination against one juror is evidence of discrimination against other jurors. *Snyder v. Louisiana*, 552 U.S. 472, 485, 478, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008).

I. *Batson* in context

Since 1879, the United States Supreme Court has recognized that race discrimination in the selection of jurors violates the Fourteenth Amendment's guaranty of equal protection. *See Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 309-10, 25 L. Ed. 664 (1879). But to contextualize *Batson* we must look to its origins.

Two decades before *Batson*, the United States Supreme Court held in *Swain v. Alabama* that purposeful discrimination in the use of peremptory challenges violates the equal protection clause. 380 U.S. 202, 223-24, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), *overruled by Batson*, 476 U.S. 79. Under *Swain*, a single act of racism was not sufficient to make out an equal protection claim; a person alleging race discrimination had to prove a long-running pattern of purposefully discriminatory acts. *Id.* at 221-22.

*Swain* did little to curb racial discrimination, establishing a "crippling burden of proof" and leaving peremptories "largely immune from constitutional scrutiny."

*Batson*, 476 U.S. at 92-93. *Batson* reexamined *Swain* in light of this reality, rejecting *Swain*'s "crippling burden" and establishing the now-familiar three-part test for scrutinizing peremptories. *Id.* at 92-93, 97-98.

Twenty-six years later it is evident that *Batson*, like *Swain* before it, is failing us. *Miller-El*, 545 U.S. at 270 (Breyer, J., concurring) ("[T]he use of race- and gender-based stereotypes in the jury-selection process seems better organized and more systematized than ever before."). A growing body of evidence shows that *Batson* has done very little to make juries more diverse or prevent prosecutors from exercising race-based challenges. Justice Breyer explains, concurring in *Miller-El* and citing a laundry list of sources concluding the same thing:

> Given the inevitably clumsy fit between any objectively measurable standard and the subjective decisionmaking at issue, I am not surprised to find studies and anecdotal reports suggesting that, despite *Batson*, the discriminatory use of peremptory challenges remains a problem. *See, e.g.*, [David C.] Baldus, [George] Woodworth, [David] Zuckerman, [Neil Alan] Weiner, & [Barbara] Broffitt, *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, 3 U. PA. J. CONST. L. 3, 52-53, 73, n. 197 (2001) (in 317 capital trials in Philadelphia between 1981 and 1997, prosecutors struck 51% of black jurors and 26% of nonblack jurors; defense counsel struck 26% of black jurors and 54% of nonblack jurors; and race-based uses of prosecutorial peremptories declined by only 2% after *Batson*); [Mary R.] Rose, *The Peremptory Challenge Accused of Race or Gender Discrimination? Some Data from One County*, 23 LAW AND HUMAN BEHAVIOR 695, 698–699 (1999) (in one North Carolina county, 71% of excused black jurors were removed by the prosecution; 81% of excused white jurors were removed by the defense); [Neely] Tucker, *In Moore's Trials, Excluded Jurors Fit Racial Pattern*, WASHINGTON POST, Apr. 2, 2001, p. A1 (in D.C. murder case spanning four trials, prosecutors excused 41 blacks or other minorities and 6 whites; defense counsel struck 29 whites and 13 black venire members); [George E.] Mize, *A Legal Discrimination; Juries Aren't Supposed to be Picked on the Basis of Race and Sex, But It Happens All the Time*, WASHINGTON POST, Oct. 8, 2000, p. B8 (authored by judge

on the D.C. Superior Court); *see also* [Kenneth J.] Melilli, *Batson in Practice: What We Have Learned About Batson and Peremptory Challenges*, 71 NOTRE DAME L. REV. 447, 462-464 (1996) (finding *Batson* challenges' success rates lower where peremptories were used to strike black, rather than white, potential jurors); [Jeffrey S.] Brand, *The Supreme Court, Equal Protection and Jury Selection: Denying That Race Still Matters*, 1994 WIS. L. REV. 511, 583-589 (examining judicial decisions and concluding that few *Batson* challenges succeed); [Eric N. Einhorn] Note, *Batson v. Kentucky and J.E.B. v. Alabama ex rel. T.B.: Is the Peremptory Challenge Still Preeminent?* 36 BOSTON COLLEGE L. REV. 161, 189, and n. 303 (1994) (same); [Jean] Montoya, *The Future of the Post-Batson Peremptory Challenge: Voir Dire by Questionnaire and the "Blind" Peremptory*, 29 U. MICH. J.L. REFORM 981, 1006, nn. 126-127, 1035 (1996) (reporting attorneys' views on the difficulty of proving *Batson* claims).

545 U.S. at 268-69. A recent report by the Equal Justice Initiative reaches the same dire conclusion: peremptory challenges have become a cloak for race discrimination. EQUAL JUSTICE INITIATIVE, ILLEGAL RACIAL DISCRIMINATION IN JURY SELECTION: A CONTINUING LEGACY (hereinafter EQUAL JUSTICE INITIATIVE REPORT) (Aug. 2010), *available at* http://eji.org/eji/files/EJI%20Race%20and%20Jury%20Report.pdf.

It would be naïve to assume Washington is somehow immune from this nationwide problem. Our Race and Equal Justice Task Force concluded that "[t]he fact of racial and ethnic disproportionality in [Washington's] criminal justice system is indisputable." TASK FORCE ON RACE AND THE CRIMINAL JUSTICE SYSTEM, PRELIMINARY REPORT ON RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM (hereinafter TASK FORCE REPORT) at 1 (2011), *available at* http://www.law.washington.edu/About/RaceTaskForce/preliminary_report_race_criminal_justice_030111.pdf.

In over 40 cases since *Batson*, Washington appellate courts have *never* reversed a conviction based on a trial court's erroneous denial of a *Batson* challenge. *See* Suppl. Br. of Pet'r at 2, App. A (collecting cases). Saintcalle's brief cites 42 Washington *Batson* cases, all of which affirm a trial court's denial of a *Batson* challenge. Of those 42 cases, 28 involve the prosecution removing every prospective juror of the same race as the defendant—usually one or two black jurors. In only six of these cases were minority jurors permitted to serve, and in eight it is unclear from the record whether minorities were permitted to serve or not. This is rather shocking and underscores the substantial discretion that is afforded to trial courts under *Batson*. And while this alone does not prove that *Batson* is failing, it is highly suggestive in light of all the other evidence that race discrimination persists in the exercise of peremptories.

In short, *Batson*, like *Swain* before it, appears to have created a "crippling burden" making it very difficult for defendants to prove discrimination even where it almost certainly exists.

II.     The changing face of race discrimination

In part, the problem is that racism itself has changed. It is now socially unacceptable to be overtly racist. Yet we all live our lives with stereotypes that are ingrained and often unconscious, implicit biases that endure despite our best efforts to eliminate them.[3] Racism now lives not in the open but beneath the

---

[3] "The general findings, confirmed by hundreds of articles in peer-reviewed scientific journals are that '[i]mplicit biases—by which we mean implicit attitudes and stereotypes—are both pervasive (most individuals show evidence of some biases), and large in magnitude, statistically speaking. In other words, we are not, on average or generally, cognitively colorblind.'" TASK FORCE REPORT, *supra*, at 19 (alteration in

surface—in our institutions and our subconscious thought processes—because we suppress it and because we create it anew through cognitive processes that have nothing to do with racial animus.

Many scholars have written on the topic of unconscious prejudice and implicit bias.[4] In one representative article, Antony Page, Batson's *Blind-Spot: Unconscious Stereotyping and The Peremptory Challenge*, 85 B.U. L. REV. 155 (2005), the author explains how unconscious biases are formed, why they persist, and how they affect our decisionmaking:

> In the late 1970s, ... as part of the "cognitive revolution," psychologists began to explore the notion that discrimination and other forms of biased intergroup judgment may result from ordinary, routine and completely normal cognitive mental processes. The results of this research suggest that a basic way in which people try to understand their world—categorization—can, of its own accord, lead to stereotyping and discrimination.

*Id.* at 181 (footnotes omitted). Explaining how race discrimination results from ordinary cognitive processes, he notes that "'[t]he human mind must think with the aid of categories .... We cannot possibly avoid this process. ... Life is just too short to have differentiated concepts about everything.'" *Id.* at 185 (quoting GORDON W. ALLPORT, THE NATURE OF PREJUDICE 20, 173 (1954) (alterations in

---

original) (quoting Jerry Kang & Kristin Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. REV. 465, 471 (2010)).

[4] *See, e.g.*, Eva Paterson, Kimberly Thomas Rapp, & Sara Jackson, *The Id, The Ego, and Equal Protection in the 21st Century: Building upon Charles Lawrence's Vision To Mount a Contemporary Challenge to the Intent Doctrine*, 40 CONN. L. REV. 1175 (2008); GORDON W. ALLPORT, THE NATURE OF PREJUDICE 20, 173 (1954); HOWARD J. EHRLICH, THE SOCIAL PSYCHOLOGY OF PREJUDICE 35 (1973); *see* Felicia Pratto & Oliver P. John, *Automatic Vigilance: The Attention-Grabbing Power of Negative Social Information*, 61 J. PERSONALITY & SOC. PSYCHOL. 380, 381 (1991).

original)). So we use schemas,[5] categories, and cognitive shortcuts that lead us to unknowingly discriminate:[6]

> Once stereotypes have formed, they affect us even when we are aware of them and reject them. Stereotypes can greatly influence the way we perceive, store, use, and remember information. Discrimination, understood as biased decision-making, then flows from the resulting distorted or unobjective information. The attorney exercising the peremptory challenge will be unaware of this biased information processing and so will be unaware of her gender- or race-based discrimination. . . .
>
> To put it simply, good people often discriminate, and they often discriminate without being aware of it.

*Id.* at 160-61 (footnotes omitted). Compounding this problem is that stereotyping is often part of our so-called "social heritage":

> [S]tereotypes about ethnic groups appear as a part of the social heritage of society. They are transmitted across generations as a

---

[5] Social schemas can exist at any level of abstraction and along any dimension, such as identity group (for example, race), character traits (for example, dominance), physical traits (for example, tall), social roles (for example, occupation), or general person impressions. Whites in America may attribute to blacks character traits such as laziness or hostility, physical traits such as kinky hair, roles such as entertainer or drug-dealer, and an overall negative person impression.

Page, *supra*, at 189.

[6] People generally match and compare incoming information with the most relevant schema or sub-schema. They then tend to order and process new related stimuli in keeping with other elements of the schema. A schema essentially operates as an implicit theory, which reflexively "directs the perceiver's attention . . . mediates inferences . . . guides judgment and evaluation; and . . . fills in . . . values for unexpected attributes." It is a way to integrate new material into familiar understanding and a way to draw conclusions beyond the information given. Not only do we assume the British are reserved or that Canadians are funny (if they are), but we also expect the British to act reserved and Canadians to be funny.

Page, *supra*, at 189-90 (alterations in original) (footnotes omitted) (quoting Eliot R. Smith, *Mental Representation and Memory*, in 1 HANDBOOK OF SOCIAL PSYCHOLOGY 391, 404 (Daniel T. Gilbert et al. eds., 4th ed. 1998)).

15

component of the accumulated knowledge of society. They are as true as tradition, and as pervasive as folklore. No person can grow up in a society without having learned the stereotypes assigned to the major ethnic groups.

HOWARD J. EHRLICH, THE SOCIAL PSYCHOLOGY OF PREJUDICE 35 (1973).

Unconscious stereotyping upends the *Batson* framework. *Batson* is only equipped to root out "*purposeful*" discrimination, which many trial courts probably understand to mean conscious discrimination. *See Batson*, 476 U.S. at 98. But discrimination in this day and age is frequently unconscious and less often consciously purposeful. That does not make it any less pernicious. Problematically, people are rarely aware of the actual reasons for their discrimination and will genuinely believe the race-neutral reason they create to mask it. *See* Page, *supra*, at 175-77. Since *Batson*'s third step hinges on credibility, this makes it very difficult to sustain a *Batson* challenge even in situations where race has in fact affected decision-making. *Id.*

More troubling for *Batson* is research showing that people will act on unconscious bias far more often if reasons exist giving plausible deniability (e.g., an opportunity to present a race-neutral reason). In one fascinating study, researchers tested peoples' unconscious desire to avoid contact with handicapped persons. "In a carefully designed experiment, researchers found that when offered a choice of two rooms in which movies were playing, people avoided the room with a handicapped person, but only when doing so could masquerade as a movie preference." TASK FORCE REPORT, *supra*, at 19 (citing Melvin L. Snyder et al., *Avoidance of the Handicapped: An Attributional Ambiguity Analysis*, 37 J. PERSONALITY & SOC. PSYCHOL. 2297, 2297, 2304 (1979)). But

when offered outright the choice of sitting next to a handicapped or nonhandicapped person, people chose to sit by the handicapped person to conceal their prejudice. *Id.*

None of this means we should turn a blind eye to the overwhelming evidence that peremptory challenges often facilitate racially discriminatory jury selection. Nor does it suggest we should throw up our hands in despair at what appears to be an intractable problem. Instead, we should recognize the challenge presented by unconscious stereotyping in jury selection and rise to meet it.

III. The constitutional value of a diverse jury

We should also recognize that there is constitutional value in having diverse juries, quite apart from the values enshrined in the Fourteenth Amendment. Article I, section 21 of our state constitution declares, "The right of trial by jury shall remain inviolate."

We have juries for many reasons, not the least of which is that it is a ground level exercise of democratic values. The government does not get to decide who goes to the lockup or even the gallows. Ordinary citizens exercise that right as a matter of democracy. In England, the jury developed into juries of one's peers, coming from one's community. This is the grand heritage of the jury system.

But equally fundamental to our democracy is that all citizens have the opportunity to participate in the organs of government, including the jury. If we allow the systematic removal of minority jurors, we create a badge of inferiority,

cheapening the value of the jury verdict. And it is also fundamental that the defendant who looks at the jurors sitting in the box have good reason to believe that the jurors will judge as impartially and fairly as possible. Our democratic system cannot tolerate any less.

From a practical standpoint, studies suggest that compared to diverse juries, all-white juries tend to spend less time deliberating, make more errors, and consider fewer perspectives. EQUAL JUSTICE INITIATIVE REPORT, *supra*, at 6, 40-41. In contrast, diverse juries were significantly more able to assess reliability and credibility, avoid presumptions of guilt, and fairly judge a criminally accused. *Id.* at 41. "By every deliberation measure, . . . heterogeneous groups outperformed homogeneous groups." *Id.* These studies confirm what seems obvious from reflection: more diverse juries result in fairer trials.

Thus, our *Batson* analysis should reflect not only the Fourteenth Amendment's equal protection guarantee, but also the jury trial protections contained in article I, section 21 of our state's constitution.

IV.    What to do about *Batson*?

Race should not matter in the selection of a jury, but under current law it often does. We conclude from this that we should strengthen our *Batson* protections, relying both on the Fourteenth Amendment and our state jury trial right.

We have a lot of flexibility to do so. The *Batson* framework anticipates that state procedures will vary, explicitly granting states flexibility to fulfill the promise of equal protection. *Batson*, 476 U.S. at 99-100 n.24 ("[W]e make no attempt to

instruct [state and federal trial] courts how best to implement our holding today."); *Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005) (recognizing that states have "flexibility in formulating appropriate procedures to comply with *Batson*"); *Hicks*, 163 Wn.2d at 489-90 (same). Indeed, the *Batson* procedure itself was born in state courts out of a growing sense that *Swain* was failing. *Batson*, 476 U.S. at 82 n.1, 99.

Likewise, we have authority under federal law to pioneer new procedures within existing Fourteenth Amendment frameworks. *Smith v. Robbins*, 528 U.S. 259, 273, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000) (states have "wide discretion, subject to the minimum requirements of the Fourteenth Amendment, to experiment with solutions to difficult policy problems"); *Dickerson v. United States*, 530 U.S. 428, 438-38, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

We can also extend greater-than-federal *Batson* protections to defendants under the greater protection afforded under our state jury trial right, a fact we recognized in *Hicks*. 163 Wn.2d at 492.

Justices Marshall and Breyer argue that the taint of racial discrimination on peremptory challenges is so strong that the only way to remove it is to eliminate the peremptory system altogether. *Batson*, 476 U.S. at 102-03 (Marshall, J., concurring); *Miller-El*, 545 U.S. at 266-67, 273 (Breyer, J., concurring). That may be so.

Justice González's concurring heartfelt opinion argues for immediate abolition of the peremptory challenge. We do not disagree with his call for the need for a departure from the *Batson* framework, but we believe that such a major

change in trial procedure should be tested in the furnace of advocacy at the trial and appellate levels, with the opportunity for input from a broad range of interests, before we abandon a procedure that was adopted by Washington's first territorial legislature over 150 years ago. "'[W]e are not in the business of inventing unbriefed arguments for parties sua sponte . . . .'" *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 138, 267 P.3d 324 (2011) (quoting *State v. Studd*, 137 Wn.2d 533, 547, 973 P.2d 1049 (1999)). Alternatively, as both we and Justice González's concurring opinion note, it might be more appropriate to consider whether to abolish peremptory challenges through the rule-making process instead of in the context of a specific case. *See infra* p. 23.

We have occasionally exercised our power to reach issues not raised by the parties, but this case does not present any of the circumstances justifying exercise of this discretionary power. The parties have not "ignore[d] a constitutional mandate, a statutory commandment, or an established precedent." *City of Seattle v. McCready*, 123 Wn.2d 260, 269, 868 P.2d 134 (1994).

With respect to our concurring colleagues, we do not believe that our call for new alternatives to the *Batson* analysis constitutes "'turn[ing] a blind eye,'" "'throw[ing] up our hands in despair,'" or "'shrink[ing] from this challenge,'" concurrence (González, J.) at 2, nor are we reluctant to change the *Batson* standard simply because the solution presents a difficult question, *see* concurrence (Stephens, J.) at 1-2. Rather, we feel that now is the time to begin the task of formulating a new, functional method to prevent racial bias in jury

selection. To do so, we seek to enlist the best ideas from trial judges, trial lawyers, academics, and others to find the best alternative to the *Batson* analysis.

But it may instead be possible to address *Batson*'s shortcomings in a more targeted fashion. The main problem is that *Batson*'s third step requires a finding of "purposeful discrimination," which trial courts may often interpret to require conscious discrimination. This is problematic because discrimination is often unconscious. A requirement of conscious discrimination is especially disconcerting because it seemingly requires judges to accuse attorneys of deceit and racism in order to sustain a *Batson* challenge. *See* Robin Charlow, *Tolerating Deception and Discrimination After* Batson, 50 STAN. L. REV. 9, 11 (1997) (noting that one judge "had the uncomfortable feeling that she had just rendered an official ruling that the attorney was lying to the court"). Imagine how difficult it must be for a judge to look a member of the bar in the eye and level an accusation of deceit or racism.[7] And if the judge chooses not to do so despite misgivings about possible race bias, the problem is compounded by the fact that we defer heavily to the judge's findings on appeal. *Hicks*, 163 Wn.2d at 486. A strict "purposeful discrimination" requirement thus blunts *Batson*'s effectiveness and blinds its analysis to unconscious racism.[8] As a first step, we should

---

[7] Likewise, "[m]any defense lawyers fail to adequately challenge racially discriminatory jury selection because they are uncomfortable, unwilling, unprepared, or not trained to assert claims of racial bias." EQUAL JUSTICE INITIATIVE REPORT, *supra*, at 6.

[8] It could be argued (although none of the parties makes this argument) that "purposeful discrimination" already encompasses unconscious bias. This argument flows from the idea that the "purposeful discrimination" requirement was never intended to be a proxy for conscious intent or anything resembling a conscious mens rea, but rather a signpost for distinguishing between discriminatory purpose and disproportionate impact. Before *Batson* was decided, it was well established that disproportionate impact alone does not

abandon and replace *Batson*'s "purposeful discrimination" requirement with a requirement that necessarily accounts for and alerts trial courts to the problem of unconscious bias, without ambiguity or confusion. For example, it might make sense to require a *Batson* challenge to be sustained if there is a reasonable probability that race was a factor in the exercise of the peremptory or where the judge finds it is more likely than not that, but for the defendant's race, the peremptory would not have been exercised. A standard like either of these would take the focus off of the credibility and integrity of the attorneys and ease the accusatory strain of sustaining a *Batson* challenge. This in turn would simplify the task of reducing racial bias in our criminal justice system, both conscious and unconscious.

However, a new, more robust framework should do more than simply acknowledge that unconscious bias is a permissible consideration in the *Batson*

---

violate the equal protection clause. *See Washington v. Davis*, 426 U.S. 229, 240, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976). It could be argued that *Batson*'s "purposeful discrimination" requirement therefore meant not that the state's attorney need be found intentionally racist, only that racial bias (conscious *or* unconscious, as the argument would go) be the source of any disparate impact. This argument finds support in scholarship and in the United States Supreme Court's equal protection jurisprudence regarding jury selection. *See, e.g., Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972) (finding that disproportionate exclusion of blacks in subjective jury selection process was clearly discriminatory even with "no evidence that the commissioners consciously selected by race"); *Batson*, 476 U.S. at 94 (citing *Alexander*); *see also Hernandez v. Texas*, 347 U.S. 475, 482, 74 S. Ct. 667, 98 L. Ed. 866 (1954) ("The result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual . . . ."); Ralph Richard Banks & Richard Thompson Ford, *(How) Does Unconscious Bias Matter?: Law, Politics, and Racial Inequality*, 58 EMORY L.J. 1053, 1090-93 (2009) (concluding that "discriminatory purpose" includes unconscious bias under current equal protection jurisprudence). This argument makes sense, but we do not consider it here. The issue was not raised or decided below, the trial court easily could have understood "purposeful discrimination" to include unconscious bias, and the facts of this case simply do not *compel* a finding of purposeful discrimination even if considering unconscious discrimination.

analysis. It should seek to eliminate this bias altogether or at least move us closer to that goal. A new framework should give trial courts the necessary latitude to weed out unconscious bias where it exists, without fear of reversal and without the need to level harsh accusations against attorneys or parties. On the other hand, it may be that Justices Marshall and Breyer are right and the problem is so dire that the only solution is to eliminate peremptory challenges altogether. *See Batson*, 476 U.S. at 102-03 (Marshall, J., concurring); *Miller-El*, 545 U.S. at 266-67, 273 (Breyer, J., concurring).

A rule change of this magnitude might also be best made through the rule-making process. This court possesses certain rule-making authority inherent in its power to prescribe rules of procedure and practice, which is supplemented by the Legislature. *State v. Templeton*, 148 Wn.2d 193, 212-13, 59 P.3d 632 (2002). We could certainly adopt a rule that would strengthen our procedures for *Batson* challenges, and this may be the most effective way to reduce discrimination and combat minority underrepresentation in our jury system.[9]

V.     Application to this case

As urgent as the need for a new framework may be, we cannot create one in this case. Neither party has asked for a new standard or framework, nor have they briefed or argued what that framework might be or how it would apply in this case. The issue also was not raised or decided at the Court of Appeals or the trial court. This means the record has not been developed in a way that will facilitate

---

[9] Ironically, Justice Stephens's concurring opinion takes this opinion to task for discussing possible solutions and then launches into a lengthy criticism of possible solutions. Concurrence (Stephens, J.) at 2-5.

our review, nor have we obtained the benefit of input from amici, including members of the bar and other stakeholders. It must wait for another case.

VI.    The trial court did not clearly err by finding there was no purposeful discrimination in this case

Instead, we apply *Batson* to this case and conclude that the trial court's finding that there was no purposeful discrimination was not clear error. A trial court's decision that a challenge is race-neutral is a factual determination based in part on the answers provided by the juror, as well as an assessment of the demeanor and credibility of the juror and the attorney. *Batson*, 476 U.S. at 98 n.21. The defendant carries the burden of proving purposeful discrimination. *Id.* at 93. The trial judge's findings are "accorded great deference on appeal" and will be upheld unless proved clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 364, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). Deference to trial court findings is critically important in *Batson* cases because the trial court is much better positioned than an appellate court to examine the circumstances surrounding the challenge. Further, deference is important because trial judges must have some assurance that the rest of the trial will not be an exercise in futility if it turns out an appellate court would have ruled on a *Batson* challenge differently.

Here, we find no clear error in the trial court's determination that the prosecution had a valid race-neutral reason to peremptorily strike Ms. Tolson. Ms. Tolson said she might have trouble sitting on the jury of a murder trial because someone she knew had recently been murdered:

I mean, I have never been in this situation where I have lost someone. You just went to the funeral. He is young. Only 24. And to be called to jury duty to perhaps be on a jury of a murder suspect. I don't know how I'm going to react. You know, I don't know. I'm—I'm not an emotional person, but I'm thinking as we go through it, and I hear the testimony, and I see the pictures, I don't know. I mean, I'm just being honest. I don't know how I'm going to feel.

RP (Mar. 10, 2009) at 43. In light of Ms. Tolson's statements throughout voir dire, we defer to the trial court's factual finding that the prosecutor was justified in believing there was a realistic possibility that she might have been "lost" as a juror before the end of the case. The record does not compel a contrary conclusion. The trial court observed the juror and agreed that she was having difficulties. Losing jurors during a lengthy trial is always a possibility, and justice is not served when a mistrial is declared or a juror is unable to view and process the evidence. Here, it was entirely reasonable for the court to conclude that the prosecutor's concerns were legitimate and race-neutral, and there was no clear error. We affirm the trial court's finding that there was no purposeful discrimination.

We do, however, acknowledge that Ms. Tolson was questioned far more than any other juror, perhaps in part because she was black. This conclusion is supported by a statistical analysis of the prosecution's voir dire that appears in Appendix A, attached to this opinion.[10] These statistics are rather striking, and in general, disparate questioning of minority jurors can provide evidence of

---

[10] The charts in Appendix A track two relevant measures of prosecutor questioning: (1) the number of questions asked of each juror by the prosecution and (2) the total number of words spoken (by both prosecutor and venireperson) in direct interaction with each prospective juror. Totals do not include statements or questions made by the prosecutor to the venire at large that were not directed to any particular juror. Totals omit voir dire by defense counsel and individual questioning conducted outside the presence of the full venire.

25

discriminatory purpose because it can suggest that an attorney is "fishing" for a race-neutral reason to exercise a strike. *See Miller-El*, 545 U.S. at 241; *Reed v. Quarterman*, 555 F.3d 364, 379 (5th Cir. 2009). However, disparate questioning does not itself prove purposeful discrimination. In some cases, there may be good reasons to question minority jurors more than nonminority jurors. Here, for example, the prosecutor began by eliciting Ms. Tolson's views on race in the criminal justice system and later spoke with her regarding the recent death of her friend. These were legitimate topics to explore.[11] We defer to the trial court that the disparate questioning in this case, while it may have been motivated in part by race, did not necessarily amount to purposeful discrimination.

We also acknowledge that the prosecution attempted to strike the only Mexican-American juror in the venire, juror 10. RP (Mar. 10, 2009) at 119-20. And while it is true that a court's finding of discrimination against one juror is evidence of discrimination against others, it does not follow that one *Batson* violation necessarily implies another. *Snyder*, 552 U.S. at 478.

Under *Batson*, we defer to the trial court's ruling.

---

[11] The chief justice's concurring opinion criticizes our reference to statistics of the number of questions asked of Ms. Tolson compared with the other jurors, asking why additional questions were asked and "many other factors" and disclaiming any reliance on statistics. Concurrence (Madsen, C.J.) at 5-6. This criticism is particularly inapt in light of this opinion's extensive quotations from the voir dire of Ms. Tolson, *id.* at 3-6, 25, and one statement that disparate questioning does not itself prove purposeful discrimination.

## CONCLUSION

Racial inequalities permeate our criminal justice system and present important moral issues we all must grapple with. Twenty-six years after *Batson*, it is increasingly evident that discriminatory use of peremptory challenges will be difficult to eradicate. We should not shrink from this challenge, but this is not the case to address it. It must wait for another day to determine how to adapt *Batson* to the realities of continuing race discrimination and fulfill the promise of equal protection.

We affirm the Court of Appeals.

No. 86257-5

_Wiggins, J._

WE CONCUR.

_Owens, J._

## APPENDIX A

| Juror Number | Questions Asked | Total Words of Interaction |
|---|---|---|
| 1 | 6 | 155 |
| 4 | 4 | 102 |
| 5 | 1 | 16 |
| 7 | 5 | 151 |
| 10 | 5 | 159 |
| 11 | 12 | 535 |
| 12 | 5 | 127 |
| 13 | 7 | 190 |
| 16 | 2 | 88 |
| 20 | 2 | 55 |
| 22 | 6 | 98 |
| 23 | 2 | 88 |
| 24 | 5 | 147 |
| 26 | 1 | 26 |
| 27 | 11 | 521 |
| 29 | 5 | 166 |
| 32 | 6 | 301 |
| 33 | 4 | 137 |
| 34 | 17 | 1165 |
| 36 | 14 | 389 |
| 39 | 1 | 89 |
| 42 | 3 | 103 |
| 43 | 3 | 128 |
| 44 | 7 | 258 |
| 46 | 4 | 228 |
| 49 | 9 | 456 |
| 50 | 1 | 44 |
| 52 | 9 | 362 |
| 55 | 4 | 125 |
| 60 | 2 | 108 |
| 62 | 5 | 118 |
| 65 | 1 | 20 |
| 66 | 6 | 407 |
| 67 | 4 | 168 |
| 69 | 4 | 149 |
| 70 | 1 | 6 |
| 72 | 2 | 40 |
| 79 | 2 | 75 |
| 80 | 3 | 36 |
| ? | 2 | 140 |
| **Grand Total** | **193** | **7676** |



Total Words of Interaction

1



**Questions Asked**



**Juror 34 Compared to Average (Total Words)**

Average: 166.95
Juror 34: 1165



**Juror 34 Compared to Average (Questions Asked)**

Average: 4.513
Juror 34: 17



**Juror 34 as a Proportion of Whole (Total Words)**

- Juror 34 (15.2%)
- Other Jurors (84.8%)



**Juror 34 as a Proportion of Whole (Questions Asked)**

- Juror 34 (8.8%)
- Other Jurors (91.2%)

2

No. 86257-5

MADSEN, C.J. (concurring)—Like my colleagues, I am concerned about racial discrimination during jury selection. Here, the issue is whether the prosecutor's use of a peremptory challenge to dismiss a black member of the jury venire was based on her race and therefore violated equal protection.

The constitutionally based evaluation established in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 69 (1986), is used to make the assessment whether purposeful discrimination occurred. In the first of the *Batson* three-step analysis, the defendant must make a prima facie showing that a peremptory challenge was made on the basis of the venire member's race. Then, in accord with the *Batson* analysis, the State must offer a race-neutral explanation for the use of the peremptory challenge and, finally, the trial judge must make a determination as to whether racial discrimination occurred.

*Batson*'s framework continues to apply to identify the constitutional equal protection violations that it was intended to reach, those involving purposeful discrimination. But as the Court advised, state courts have some flexibility to develop procedures to comply with *Batson*. *Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct.

2410, 162 L. Ed. 2d 129 (2005); *see State v. Hicks*, 163 Wn.2d 477, 489-90, 181 P.3d 831 (2008). Recently, for example, in *State v. Rhone*, 168 Wn.2d 645, 229 P.3d 752 (2010), five members of the court agreed that the defendant can establish the prima facie case when the record shows that the prosecution exercised a peremptory challenge against the only remaining member of the venire who is in the same constitutionally cognizable racial group as the defendant. *Id.* at 661 (Alexander, J., dissenting); *id.* at 658 (Madsen, C.J., concurring).[1] I agreed with the *Rhone* dissent on this point, but also said that this means of establishing the prima facie case should be applied only in future cases, going forward. *Id.* Thus, since the present case arose before *Rhone* was issued, the alternative approach set out in the dissent in *Rhone* is not at issue.

Beyond the constitutional inquiry, which is aimed at purposeful discrimination, there are growing concerns about unconscious and implicit racial biases that could also affect jury selection. Both the lead opinion and some of the concurrences consider such concerns at some length.

But the constitutional test from *Batson* is intended to reach *purposeful* discriminatory exercise of the peremptory challenge "based on either the race of the juror or the racial stereotypes held by the party." *Georgia v. McCollum*, 505 U.S. 42, 59, 112

---

[1] Among other things, the lead opinion in *Rhone* observed that the Court in *Batson* overruled a prior test focusing on systematic discrimination. *Rhone*, 168 Wn.2d at 652 n.4 (discussing *Miller-El v. Dretke*, 545 U.S. 231, 269-70, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005); *Batson*; and *Swain v. Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), *overruled by Batson*, 476 U.S. 79). The Court noted that in cases decided after *Swain*, it had "recognized that a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case.*" *Batson*, 476 U.S. at 95.

2

S. Ct. 2348, 120 L. Ed. 2d 33 (1992). We have not been asked to reassess or modify the *Batson* approach or to address any policy-based nonconstitutional analyses or nonpurposeful discrimination based on race during jury selection.[2] Nonetheless, both the lead opinion and Justice González's concurrence discuss possible approaches to address implicit or unconscious discrimination and Justice González calls for abolishment of peremptory challenges to resolve the problem.

The peremptory challenge is an important "state-created means to the constitutional end of an impartial jury and a fair trial." *Id.* at 58; *accord State v. Latham*, 100 Wn.2d 59, 70, 667 P.2d 56 (1983) (the peremptory challenge "is an important and substantial right which protects a party's constitutional right trial by jury") (citing *Smith v. Kent*, 11 Wn. App. 439, 523 P.2d 446 (1983)). Eliminating the peremptory challenge would be an enormous change in our system and certainly one the court should not consider lightly and certainly should not implement sua sponte.

In my view, the analysis in this case should be limited to the issues raised by the parties. The case should be decided under *Batson*'s "purposeful discrimination" constitutional standard and should not be a forum for discussing how to counter "implicit" or "unconscious" discrimination when these questions have not been raised by the parties. The danger inherent in such discussions is the probability that the court will

---

[2] As the lead opinion notes, "[n]either party has asked for a new standard or framework, nor have they briefed or argued what that framework might be or how it would apply in this case," the issue was not raised or decided at the Court of Appeals, and amici, the bar, and other "stakeholders" have not provided any input. Lead opinion at 23-24. The lead opinion also says that this case does not present circumstances calling for exercise of our discretionary power to reach issues not raised by the parties. *Id.* at 20.

3

not be fully and completely informed, despite all best efforts, about all aspects of the matter when we have only our own investigation, research, and analysis to consider. The rich tradition of briefing in appellate courts ensures not only that we consider the issues that the parties raise but that we are well informed. The range of resources expands tremendously when, rather than our own research and that provided by the parties, we have in addition input from other interested entities—when a new court rule is proposed, for example.

Here, when the prosecutor used a peremptory challenge to dismiss jury venire member Ms. Anna Tolson, the only black member of the venire, the defendant objected and established a prima facie case of discrimination. The prima facie case was easily made because the prosecutor singled this juror out, making it abundantly clear that he did so on the ground that, because of her race, she would have a different viewpoint from the rest of the venire. The judge appropriately required the prosecutor to explain why the peremptory challenge was exercised and then found that the prosecutor was justified in believing there was a realistic possibility that Ms. Tolson might be lost as a juror before the trial concluded, especially since she had very recently lost someone who was murdered. The judge's ruling was not an abuse of discretion.

Finally, I offer a brief comment on the lead opinion's appended charts totaling the number of questions and words with respect to each prospective juror. We are not a group of qualified statisticians. One does not have to look very far to find a significant mistake made by this court when attempting to resolve a question in a case involving

4

statistics. In a prosecution for murder, in which DNA (deoxyribonucleic acid) evidence was an important part of the State's case, we originally rejected the State's expert's testimony that the defendant's DNA was a 1 in 19.25 billion "match" to the forensic sample. We concluded that this was basically an assertion that the defendant was the only person with this DNA profile because the 19.25 billion figure was almost four times the population of the earth. *State v. Buckner*, 125 Wn.2d 915, 890 P.2d 460 (1995). On reconsideration, we recognized our error: "Contrary to our original view in this case, we now recognize that a profile probability of 1 in 20 billion or other number greater than the earth's population may be admissible, as the state of forensic DNA analysis allows for such probabilities." *State v. Buckner*, 133 Wn.2d 63, 66, 941 P.2d 667 (1997). The mistaken first opinion had, in fact, been singled out as a bad example of statistical analysis of forensic DNA typing. Comm. on DNA Forensic Science: An Update, Nat'l Research Council, The Evaluation of Forensic DNA Evidence (Nat'l Acad. Press 1996).

Without knowing what topics were discussed, why additional questions were asked, whether individual prospective jurors had personal characteristics that may have affected the number of questions asked (hearing difficulties, comprehension levels, etc.) or personal tendencies such as to respond at length or to ask repeatedly for clarification, and likely many other factors, it is insufficient to count questions or individual words. While a marked difference in questioning may suggest discrimination, I would not rely

on charts to show discrimination based on the number of questions asked or the length of

the interactions with individuals during voir dire.[3]

I concur in the result reached in the lead opinion but write separately to express

disagreement with going beyond the arguments of the parties.

_____

[3] Although the lead opinion notes that there are limitations to relying on statistics, inclusion of detailed graphs and pie charts suggests the opposite.

_Madsen, C.J._

*State v. Saintcalle (Kirk Ricardo)*

No. 86257-5

STEPHENS, J. (concurring)—Between Justice Wiggins's lead opinion, Chief Justice Madsen's and Justice González's concurring opinions, and Justice Chambers's dissenting opinion, thousands of words have been written in this case. Only a fraction speak to the actual result: the court affirms Kirk Saintcalle's conviction, finding no violation of equal protection under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). I concur in this result.

I write separately to sound a note of restraint amidst the enthusiasm to craft a new solution to the problem of the discriminatory use of peremptory challenges during jury selection. The difficulties inherent in this area have long been recognized, but it is easier to name the problem than to solve it. *See* Jeffrey Bellin & Junichi P. Semitsu, *Widening* Batson*'s Net to Ensnare More than the Unapologetically Bigoted or Painfully Unimaginative Attorney*, 96 CORNELL L. REV. 1075, 1106-08 (2011) (surveying plans to reform the peremptory challenge, but noting most "are unlikely to resonate beyond the academy and particularly unlikely to resonate with legislatures who must implement any such reform

proposal"); Peter J. Henning, *Prosecutorial Misconduct and Constitutional Remedies*, 77 WASH. U. L. Q. 713, 796 (1999) (admitting that reform in this area "is easier said than done"). Perhaps the reluctance of both the lead opinion and Justice González's concurrence to adopt the solutions they suggest belies this concern.[1]

Before embracing any new solution, I think it is important to carefully consider our authority as a court sitting in review. We are not acting in our rule-making capacity. And, obviously it is not our role to legislate. We should not skim over the question of what is involved in changing the *Batson* standard (as Justice Wiggins favors), eliminating peremptory challenges entirely (as Justice González advocates), or exercising our inherent supervisory power to fashion rules to address "the pernicious effect of unconscious racism" (as Justice Chambers suggests). Dissent (Chambers, J.) at 2. Because the issue is entirely unbriefed, we are not adequately informed on all sides of the question. I offer a few observations that give me pause.

First, the rule announced in *Batson* is narrow, placing a constitutional limit on the exercise of peremptory challenges based on a finding of purposeful

---

[1] It is also noteworthy that neither of these opinions would find a satisfactory solution to the discrimination problem in the rule proposed by the dissent in *State v. Rhone*, 168 Wn.2d 645, 659, 229 P.3d 752 (2010) (Alexander, J., dissenting). Under that rule, the *Batson* threshold of purposeful discrimination would remain and parties would retain the right to exercise peremptory challenges; however, the party proposing to strike "the only remaining minority member of the defendant's cognizable racial group or the only remaining minority in the venire," would be required to provide a race-neutral reason for doing so. *Id.* at 663 (Alexander, J., dissenting).

discrimination.[2] Under controlling precedent from the United States Supreme Court, this is the reach of the federal equal protection clause to invalidate a party's exercise of peremptory challenges, whether such challenges are authorized by statute or court rule or both. Justice Wiggins suggests that "our *Batson* analysis should reflect not only the Fourteenth Amendment's equal protection guaranty, but also the jury trial protections contained in article I, section 21 of our state's constitution." Lead opinion at 18. I am unsure what this means, and no one has suggested that our state jury trial right requires restricting or eliminating the use of peremptory challenges. To the contrary, courts have consistently recognized peremptory challenges as integral to "assuring the selection of a qualified and unbiased jury." *Batson*, 476 U.S. at 91; *State v. Vreen*, 99 Wn. App. 662, 666-68, 994 P.2d 905 (2000) (recognizing defendant's exercise of for-cause and peremptory challenges as part of right to fair trial and impartial jury under federal Sixth Amendment and article I, sections 21 and 22 of our state constitution); *State v. Rhone*, 168 Wn.2d 645, 654, 229 P.3d 752 (2010) (noting *Batson* did not transform "a shield against discrimination into a sword cutting against the purpose of a peremptory challenge"). Thus, it may be as valid an argument to say that the state jury trial right enshrines peremptory challenges as to say it restricts them.

---

[2] This is consistent with other areas of discrimination law, most notably employment law from which the *Batson* three-part, burden-shifting analysis is drawn. *See Batson*, 476 U.S. at 94 n.18 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978) (noting that the *McDonnell Douglas* framework "is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination").

Second, the solutions proposed by both the lead opinion and Justice González's concurrence go far beyond invalidating peremptory challenges that violate the equal protection rights of litigants and jurors recognized in *Batson* and its progeny. We should therefore at least acknowledge the existence of a subconstitutional "right" of litigants to participate in jury selection by exercising both for-cause and peremptory challenges. Justice González's concurrence seems to assume that peremptory challenges are wholly within our purview to eliminate. But, we are not the only branch of government concerned with fairness and impartiality in jury trials. Among the statutes in play is RCW 2.36.080, which addresses jury selection and provides in relevant part:

> (3) A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin, or economic status.
> (4) This section does not affect the right to peremptory challenges under RCW 4.44.130.

While the procedural mechanism for exercising juror challenges in criminal cases has largely moved from statute to court rule, the general provisions in chapter 2.36 RCW apply and the court rules in several instances incorporate or restate the statutory framework. *See* CrR 6.4. How we could deny a litigant a *constitutionally valid* exercise of peremptory challenges secured by statute or court rule is an unexamined question.

The most thorough discussion in Washington case law of what the "right" to peremptory challenges means is the Court of Appeals opinion in *Vreen*, 99 Wn. App. 662. At his trial, the defendant, Vreen, who is African-American, attempted

to exercise a peremptory challenge to remove the sole African-American member of the jury pool. The State objected under *Batson*, and the court rejected Vreen's stated race-neutral reason for the juror's removal–that the juror was a pastor and retired serviceman and therefore of "an authoritarian mind-set." *Id.* at 665-67. Vreen appealed his conviction, contesting the denial of his peremptory challenge. On appeal, the State conceded that the trial court erred in sustaining its *Batson* objection but argued that the erroneous denial of Vreen's peremptory challenge did not require reversal in the absence of prejudice. *Id.* at 667-68. The Court of Appeals disagreed, noting that "the interplay of challenges for cause and peremptory challenges . . . assures [a] fair and impartial jury." *Id.* at 668. It concluded that "[a]lthough the denial of a peremptory challenge may not be an issue of constitutional dimension, it is, nevertheless, an important right." *Id.* Based on the violation of this right, the court granted Vreen a new trial. *Id.* at 671; *accord State v. Bird*, 136 Wn. App. 127, 133-34, 148 P.3d 1058 (2006) (following *Vreen* and granting new trial where defendant was wrongly denied peremptory challenge). I, for one, would like to know more about how the principles discussed in *Vreen* and similar cases inform our consideration of possible solutions to the problem of discrimination in jury selection.

As noted, my purpose today is to sound a note of restraint. We held to the *Batson* standard in *Rhone*, and we do so again today. I do not criticize my colleagues for embracing an opportunity to explore a thorny issue, but I believe there are better avenues than judicial opinions to do so.

_____

No. 86257-5

GONZÁLEZ, J. (concurring)—This splintered court is unanimous about one thing: Racial bias in jury selection is still a problem—"Solutions to the Problem, Of Course, wait." 3 Langston Hughes, *Dinner Guest: Me, in* THE COLLECTED WORKS OF LANGSTON HUGHES 173 (Arnold Rampersad ed., 2001). *Batson* challenges have not ended racial bias in jury selection. Only once has a race-based *Batson* challenge resulted in reversal in Washington. *See State v. Cook,* No. 67332-7-I (Wash. Ct. App. May 28, 2013). With the exception of Justice Chambers, my colleagues recast their unwillingness to act as virtuous restraint. Lead opinion at 2; concurrence (Madsen, C.J., joined by J.M. Johnson, J.) at 3-4; concurrence (Stephens, J., joined by C. Johnson and Fairhurst, JJ.) at 1.

There are half-measures that may reduce the amount of bias in the jury selection process, such as tighter control of questioning based on the federal court model or reduction of the number of peremptory challenges that may be exercised. I believe, however, it is time to abolish peremptory challenges. Peremptory challenges are used in trial courts throughout this state, often based largely or entirely on racial stereotypes or generalizations. *See infra* pp. 15-29. As a result, many qualified

1

persons in this state are being excluded from jury service because of race. At the same time, trial and appellate courts cannot reliably identify which particular challenges involve racial discrimination and which do not. *See infra* pp. 30-34. Moreover, the use of peremptory challenges contributes to the historical and ongoing underrepresentation of minority groups on juries, imposes substantial administrative and litigation costs, results in less effective juries, and unfairly amplifies resource disparity among litigants—all without substantiated benefits. *See infra* pp. 38-52. The peremptory challenge is an antiquated procedure that should no longer be used.

As the lead opinion rightly states, we must "recognize the challenge presented . . . and rise to meet it." Lead opinion at 17. We must not "turn a blind eye," "throw up our hands in despair," or "shrink from this challenge"—but that is precisely what the majority of this court does in this case. Lead opinion at 17, 27; lead opinion at 2; concurrence (Madsen, C.J., joined by J.M. Johnson, J.) at 1, 3; concurrence (Stephens, J., joined by C. Johnson and Fairhurst, JJ.) at 1, 5. Petitioner Kirk Saintcalle complains that racial discrimination was behind the use of a peremptory challenge at his trial and also points out that our current procedural framework is failing to address this ongoing problem. He is right about the ongoing failure of our procedural framework. The majority of this court acknowledges the problem, but does nothing about it. Yet this court has a duty to ensure that the trial procedures it oversees and maintains do not propagate racial discrimination. We can fix this problem directly. We should abolish peremptory challenges in our courts.

That said, although the peremptory challenges at Saintcalle's trial constituted error, Saintcalle is not entitled to reversal of his conviction. Given that trial courts throughout the state have been allowing peremptory challenges in good faith to this point, and because peremptory challenges are not always harmful or pernicious, the erroneous allowance of a peremptory challenge does not warrant reversal in every case. *See, e.g., Creech v. City of Aberdeen*, 44 Wash. 72, 73-74, 87 P. 44 (1906) (erroneous allowance of peremptory held harmless); *cf. Rivera v. Illinois*, 556 U.S. 148, 157, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009) (noting the significance of a "court's good-faith error"). Instead, reversal is warranted on appeal only if the trial court (1) acted in bad faith in allowing the challenge or (2) allowed the challenge in good faith but failed to comply with *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

One of the reasons why we must abolish peremptory challenges is because it is too difficult to identify the presence of racial discrimination under *Batson* in any given case and thus, too difficult to identify the individual cases that warrant reversal. In this particular case, the trial court acted in good faith and did not commit clear error in allowing the challenge to prospective juror Tolson. Thus, I concur in the judgment because under the appropriate framework for deciding this case, Saintcalle is not entitled to reversal of his conviction.

## I.  A DUTY TO ACT

We must address the ongoing problem of racial discrimination in the use of peremptory challenges. Otherwise, we ignore our duty to resolve disputes fully, fairly, and effectively and to ensure that trial procedures in this state promote justice and comply with the federal and state constitutions.

In order to fully, fairly, and effectively adjudicate Saintcalle's claim we must address the presence of racial discrimination within our jury selection procedures. The primary duty of this court is "to see that justice is done in the cases which come before it, which fall within its jurisdiction." *O'Connor v. Matzdorff*, 76 Wn.2d 589, 600, 458 P.2d 154 (1969); *see also* RAP 1.2(a), (c); 7.3. Accordingly, this court has "frequently recognized it is not constrained by the issues as framed by the parties" and will "reach issues not briefed by the parties if those issues are necessary for decision." *City of Seattle v. McCready*, 123 Wn.2d 260, 269, 868 P.2d 134 (1994) (citing cases); *State v. Aho*, 137 Wn.2d 736, 740-41, 975 P.2d 512 (1999) (citing cases); *Hall v. Am. Nat'l Plastics, Inc.*, 73 Wn.2d 203, 205, 437 P.2d 693 (1968) (noting that courts "frequently decide crucial issues which the parties themselves fail to present" (citing cases)). In other words, we will resolve whatever legal issues must be resolved to properly adjudicate the claims and issues raised on appeal. In this case, Saintcalle has complained that the prosecutor in his case was allowed to exercise a racially discriminatory peremptory challenge. *See* Suppl. Br. of Pet'r at 3. Saintcalle argues

4

that "'[r]acial iniquities permeate Washington's criminal justice system,'"[1] that this state has "fail[ed] to enforce the Equal Protection Clause under *Batson*," and that "'[t]he dearth of recent cases in which courts have actually found racial discrimination in jury selection suggests not that such discrimination doesn't occur, but that the judiciary has failed to identify and remedy it.'"[2] *Id.* at 3-4. Accordingly, this case does bring into question the underlying validity of peremptory challenges and the proper framework for reviewing the use of such challenges, even if Saintcalle has not explicitly requested that we alter our court rules or jury selection process. In order to justly and properly resolve Saintcalle's claim, we must address the deeply flawed procedural and appellate framework in which it arose.

Instead, today this court fails to ensure that none of our trial procedures propagate injustice. We have "inherent power to govern court procedures" as "a necessary adjunct of the judicial function." *City of Seattle v. Hesler*, 98 Wn.2d 73, 80, 653 P.2d 631 (1982); *see also* RCW 2.04.190; *State v. Gresham*, 173 Wn.2d 405, 428-29, 269 P.3d 207 (2012); *State v. Templeton*, 148 Wn.2d 193, 212, 59 P.3d 632 (2002); *Marine Power & Equip. Co. v. Indus. Indem. Co.*, 102 Wn.2d 457, 461, 687 P.2d 202 (1984); *State v. Fields*, 85 Wn.2d 126, 129, 530 P.2d 284 (1975); *State v. Smith*, 84 Wn.2d 498, 501-02, 527 P.2d 674 (1974); *State ex rel. Foster-Wyman*

---

[1] Quoting TASK FORCE ON RACE AND THE CRIMINAL JUSTICE SYSTEM, PRELIMINARY REPORT ON RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM 7 (2011) (alteration in original).

[2] Quoting Bidish Sarma, Commentary, *When Will Race No Longer Matter in Jury Selection?* 109 MICH. L. REV. First Impressions 69, 72 (2011) (alteration in original), *available at* http://www.michiganlawreview.org/assets/fi/109/sarma2.pdf.

*Lumber Co. v. Superior Court,* 148 Wash. 1, 4-12, 267 P. 770 (1928). This well-established authority includes the power to create, modify, or waive court rules, *see* GR 9(j)(1); *O'Connor,* 76 Wn.2d at 595-97, 600, as well as the power to exercise supervisory authority over the courts of this state, *see State v. Bennett,* 161 Wn.2d 303, 317-18 & n.11, 165 P.3d 1241 (2007). Our authority in this context is plenary and thus our procedural rules "cannot be abridged or modified by the legislature," *Smith,* 84 Wn.2d at 502, although the legislature may supplement our procedural rules by statute, *see Gresham,* 173 Wn.2d at 428. In accordance with our primary duty to seek justice in the cases that come before us, and because "'[n]o rule of this court was ever intended to be an instrument of oppression or injustice,'" we have "suspended the rules where justice demanded it." *O'Connor,* 76 Wn.2d at 595-96 (quoting *State v. Brown,* 26 Wn.2d 857, 865, 176 P.2d 293 (1947)); *see, e.g., id.* at 596, 600 (excepting indigents from court rule and statute imposing filing fee); *cf. Sackett v. Santilli,* 146 Wn.2d 498, 504, 47 P.3d 948 (2002) (noting this court cannot "contradict the state [or federal] constitution by court rule").

The use of peremptory challenges in our courts is exactly the type of trial court practice over which we have inherent and ongoing authority. *See State v. Tharp,* 42 Wn.2d 494, 501, 256 P.2d 482 (1953) ("[T]he selection of the jury is procedural."); *see also Fields,* 85 Wn.2d at 129. There is no constitutional requirement that peremptory challenges be included within our trial procedures. *See, e.g., Rivera v. Illinois,* 556 U.S. 148, 152, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009); *Georgia v.*

6

*McCollum,* 505 U.S. 42, 57, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992) (citing cases);

*State v. Persinger,* 62 Wn.2d 362, 365-66, 382 P.2d 497 (1963); *Crandall v. Puget*

*Sound Traction, Light & Power Co.,* 77 Wash. 37, 40, 137 P. 319 (1913). Thus,

peremptory challenges continue to be used in our courts only insofar as we allow them

to be used.

If we truly are unsure of the appropriate way to address the ongoing racial

discrimination within our jury selection procedures, we should ask for further

briefing. *See* RAP 10.6(c), 12.1(b). But as is explained below, the need to abolish

peremptory challenges "is so apparent that additional briefing is unnecessary." *Aho,*

137 Wn.2d at 741 (noting that in a rare case in which "briefing is not necessary to full

and fair resolution of the issue" we can "decide the issue without additional briefing"

(citing cases)). Even if we might eventually be able to devise a framework that

incorporates peremptory challenges in some form while adequately addressing the

problems described below, we should at the very least abolish the use of peremptory

challenges until that time. Again, to the extent that members of this court remain

unsure, the proper course of action is to request further briefing, not to ignore the

problem.

## II.    THE NEED TO ABOLISH PEREMPTORY CHALLENGES

We must abolish peremptory challenges in the courts of this state. Our system

of voir dire and juror challenges, including causal challenges and peremptory

challenges, is intended to secure impartial jurors who will perform their duties fully

7

and fairly. In practice, however, litigants generally use peremptory challenges to remove qualified and fair jurors whom they deem likely to favor the other side in a close case. Many such challenges are based on nothing more than racial stereotypes or generalizations. But there is no accurate and reliable way to identify which peremptory challenges are based on race and which are not. In addition, peremptory challenges contribute to the underrepresentation of minority groups on juries, impose substantial administrative costs, result in less effective juries, and amplify resource disparity in litigation—without any substantiated benefits.

The peremptory challenge was first created in England to serve purposes that are now irrelevant and outdated, and it was adopted in the Washington Territory without substantial debate, at a time when racial minorities and women were completely ineligible for jury service. Peremptory challenges have been used in Washington since that time but without any serious consideration of their usefulness, and they remain an optional trial procedure subject to our plenary oversight. To prevent ongoing violations of the federal and state constitutions, and more generally as a matter of policy, we should abolish peremptory challenges in this state.

Many jurists and scholars have called for the elimination of peremptory challenges but no jurisdiction in the United States has been willing to be the first to take that necessary step. *See, e.g.*, *Flowers v. State*, 947 So. 2d 910, 937-39 (Miss. 2007). It should be remembered that in 1911, Washington became only the second state in the nation to allow women to serve on juries. *See* Joanna L. Grossman,

*Women's Jury Service: Right of Citizenship or Privilege of Difference?*, 46 STAN. L. REV. 1115, 1135 n.118 (1994) (citing LAWS OF 1911, ch. 57, § 1). Prior to that time, the Supreme Court of the Washington Territory proved unwilling to break free from the long standing and entrenched legal tradition of all-male juries. *See Harland v. Territory*, 3 Wash. Terr. 131, 137, 13 P. 453 (1887) (Turner, J.), *overruling Rosencrantz v. Territory*, 2 Wash. Terr. 267, 5 P. 305 (1884); *see also Rosencrantz*, 2 Wash. Terr. at 278-79, 281 (Turner, J., dissenting) (arguing that trial by jury at common law properly required "the jury should be composed of men" because "inherent and acquired differences between himself and wife in mental and physical constitution . . . will continue to operate to give the husband paramount authority in the household . . . until an upheaval of nature has reversed the position of man and woman in the world"). A long standing but antiquated legal tradition should never blind us to the paramount need to ensure that our trial procedures are just. Nor should any progress we have made blind us to the need for further progress. *See id.* at 278-79 ("It is said that the rights of the weaker sex . . . are more regarded than in the days of Blackstone; and that the theory of that day . . . has been exploded by the advanced ideas of the nineteenth century. This may be true. No man honors the sex more than I. None has witnessed more cheerfully the improvement in the laws of the States, and particularly in the laws of this Territory, whereby many of the disabilities of that day are removed from them . . . . I cannot say, however, that I wish to see them perform the duties of jurors."). It is time once again for Washington to shed an antiquated and

unjust rule and to lead the nation in the pursuit of justice and equality in jury selection.

### 1. Voir Dire and Juror Challenges

To understand the role of peremptory challenges in jury selection, we must first consider the purposes and general framework of jury selection as a whole. The underlying goal of the jury selection process is "to discover bias in prospective jurors" and "to remove prospective jurors who will not be able to follow [] instructions on the law," and thus, to ensure an impartial jury, a fair trial, and the appearance of fairness. *State v. Davis,* 141 Wn.2d 798, 824-26, 10 P.3d 977 (2000). The jury selection process includes the questioning of jurors during voir dire and the exercise of causal and peremptory challenges to remove individual prospective jurors from the venire, until a sufficient number of qualified jurors have been designated for service in the case. *See* CrR 6.3, 6.4, 6.5; CR 47; RCW 4.44.120-.250. The nature and scope of voir dire is left largely to the discretion of the trial court. *See, e.g., Skilling v. United States,* ___ U.S. ___, 130 S. Ct. 2896, 2917, 177 L. Ed. 2d 619 (2010); *Davis,* 141 Wn.2d at 825. We have noted that the scope of this process "should be coextensive with its purpose." *State v. Laureano,* 101 Wn.2d 745, 758, 682 P.2d 889 (1984), *overruled on other grounds by State v. Brown,* 111 Wn.2d 124, 132-33, 761 P.2d 588 (1988).

Challenges for cause are the primary method of excluding prospective jurors from service. Unlike peremptory challenges, for which no reason need be given,

challenges for cause require a showing to the satisfaction of the trial court that a particular juror is unqualified for service in the case. A "general" causal challenge alleges that a prospective juror is unqualified to serve in *any* case because of insufficient age, lack of citizenship, lack of local residency, inability to sufficiently communicate or comprehend, disenfranchisement, or a substantial and material insufficiency in mind or body. *See* RCW 4.44.150, .160; RCW 2.36.070; *see also* CrR 6.4(c)(1), (2). A "particular" causal challenge alleges that a prospective juror is unqualified to serve in the particular case before the court, due to a blood relation, other special relationship, or personal interest that renders the prospective juror unqualified as a matter of law ("implied bias"); or due to inability to be impartial in fact ("actual bias"); or due to some bodily condition that renders the juror unable to serve in the particular case. *See* RCW 4.44.150, .170, .180, .190; *see also, e.g., State v. Noltie*, 116 Wn.2d 831, 838, 809 P.2d 190 (1991). Jurors also may be excused "upon a showing of undue hardship, extreme inconvenience, public necessity, or any reason deemed sufficient by the court . . . ." RCW 2.36.100(1); *State v. Roberts*, 142 Wn.2d 471, 519, 14 P.3d 713 (2000).

One primary purpose of the voir dire process is to determine whether prospective jurors harbor "actual bias" and are thus unqualified to serve in the case. *See, e.g., Tharp*, 42 Wn.2d at 499. To be free from actual bias, a juror must be able to (1) set aside personal beliefs, opinions, or values insofar as is necessary to follow the law and decide the case fairly, *see, e.g., Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct.

1639, 6 L. Ed. 2d 751 (1961); *State v. Moody*, 18 Wash. 165, 169-70, 51 P. 356 (1897); (2) adjudicate disputed factual issues based solely on the evidence that is allowed and presented at trial, *see, e.g., Skilling*, 130 S. Ct. at 2913; *State v. Patterson*, 183 Wash. 239, 246, 48 P.2d 193 (1935); and (3) be free from the undue influence of any special relationships or personal interests (even if such relationships or interests do not qualify as implied bias), *see Stinson v. Sachs*, 8 Wash. 391, 393, 36 P. 287 (1894).

In any given case, the appropriate resolution of a challenge for actual bias is left to the discretion of the trial court. *See, e.g., Reynolds v. United States*, 98 U.S. (8 Otto) 145, 155, 25 L. Ed. 244 (1878); *Skilling*, 130 S. Ct. at 2923-24; *State v. Gilcrist*, 91 Wn.2d 603, 611, 590 P.2d 809 (1979). A deferential standard of review is appropriate for two primary reasons. First, an adjudication of actual bias usually will incorporate factual findings and a consideration of the totality of the circumstances. *See Patton v. Yount*, 467 U.S. 1025, 1036 n.12, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984); *Patterson*, 183 Wash. at 244-45. For example, a juror's mere assertion that she or he is impartial (or is overly biased) is not dispositive, in part because jurors may not fully appreciate or accurately state the nature of their own biases. *See, e.g., Skilling*, 130 S. Ct. at 2925; *Wainwright v. Witt*, 469 U.S. 412, 424-25, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985); *Patterson*, 183 Wash. at 245; *Moody*, 18 Wash. at 169. Second, there is no rule of general applicability that can be effectively constructed to govern determinations of actual bias. *See Irvin*, 366 U.S. at 724-25 (noting that

12

"'[i]mpartiality is not a technical conception'" and there is no "'ancient and artificial formula'" or "'particular tests'" by which to determine actual bias (quoting *United States v. Wood*, 299 U.S. 123, 145-46, 57 S. Ct. 177, 81 L. Ed. 78 (1936))). In some cases, whether a given juror must be excluded will be "'fairly debatable'" and thus will remain subject to the trial court's discretion. *State v. Sisouvanh*, 175 Wn.2d 607, 624, 290 P.3d 942 (2012) (internal quotation marks omitted) (quoting *Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979)); *compare Gilcrist*, 91 Wn.2d at 611 (in suit brought by two prison inmates, no abuse of discretion in refusing to exclude grounds keeper of junior college who had previously worked with some inmates taking classes and "didn't like the way the inmates 'conducted themselves' there or 'the way they took care of equipment'"), *with Beach v. City of Seattle*, 85 Wash. 379, 384, 148 P. 39 (1915) (in suit by plaintiffs injured in transit from social dance, no abuse of discretion in excluding juror who "was decidedly opposed to dances"). But in other cases, the need to excuse a juror for actual bias will be so apparent that the trial court's refusal to do so will be deemed an abuse of discretion. *See, e.g., State v. Parnell*, 77 Wn.2d 503, 507-08, 463 P.2d 134 (1970) (abuse of discretion in failing to exclude juror who had attended criminal defendant's preliminary hearing and then gave an "obviously hostile answer" to defense counsel's question on the subject), *overruled on other grounds by State v. Fire*, 145 Wn.2d 152, 163, 34 P.3d 1218 (2001).

13

The allowance of causal challenges remains the primary method by which we ensure impartial juries in this state. There is no limit on the number of causal challenges allowed. The basis for a causal challenge must be specified and proved, in order to create a sufficient record for appeal, to avoid "sharp practice" and to serve the ends of justice. *State v. Biles*, 6 Wash. 186, 188, 33 P. 347 (1893); *see State v. Lloyd*, 138 Wash. 8, 14-15, 244 P. 130 (1926) (rules of evidence apply); RCW 4.44.240. In contrast, litigants are afforded a limited number of peremptory challenges and generally need not specify any reasons for such challenges. *See* CrR 6.4(e)(1); RCW 4.44.130, .140. The use of peremptory challenges is intended to supplement our overarching framework of excluding unqualified jurors for cause.

*2. Peremptory Challenges in Practice*

The actual use of peremptory challenges within our jury selection process presents a divergence between theory and practice. In theory, peremptory challenges are supposed to further the goal of an impartial jury. *See Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 n.9, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) ("The process is to ensure a fair impartial jury, not a favorable one."); *State v. Larkin*, 130 Wash. 531, 533, 228 P. 289 (1924), *aff'd*, 132 Wash. 698, 232 P. 695 (1925). In practice, however, litigants simply use peremptory challenges to remove the prospective jurors they perceive to be least favorable to their position, regardless of whether such prospective jurors possess biases so severe as to render their participation unfair. *See, e.g., Larkin*, 130 Wash. at 533; *see also, e.g.*, JAMES J.

14

GOBERT & WALTER E. JORDAN, JURY SELECTION: THE LAW, ART, AND SCIENCE OF SELECTING A JURY xii (2d ed. 1990) ("Attorneys on each side [] vie to choose jurors favorably disposed . . . . The key is to identify subconscious partiality, since blatantly partial jurors will in effect identify themselves and can be challenged for cause."); WALTER F. ABBOTT, ANALYTIC JUROR RATER 1, 21 (1987); 2 ANN FAGAN GINGER, JURY SELECTION IN CIVIL & CRIMINAL TRIALS § 18.2, at 1022 (1985) ("Despite its theoretical function, the voir dire is in reality a contest between the two adversaries toward the goal of selecting the jury that is most favorable to [either] side.").

The reason trial attorneys are so concerned with favoritism in jury selection is because most cases that go to trial are close cases. When the likely outcome is clear, parties tend to settle, either to avoid the costs of litigation or to obtain some other benefit, such as a lenient sentencing recommendation. *Cf.* V. HALE STARR & MARK MCCORMICK, JURY SELECTION at 3-3 (4th ed. 2010) (vast majority of cases settle). Further, judges generally do not allow cases to go to trial unless there is a reasonable factual dispute for the jury to resolve. *See* CR 56; CrR 8.3(c). The only exception is a criminal case involving overwhelming evidence of guilt, which still must go to a jury. But if a case is not close, then the subtle biases of each juror almost certainly will not affect the final verdict. *See* ABBOTT, *supra,* at 112; GOBERT & JORDAN, *supra,* at xii.

The task of determining the favorability of jurors is difficult, in part because of the limited information available about each juror and his or her relevant knowledge, beliefs, opinions, and values, and also because of the difficulty of predicting a given

individual's likely beliefs and opinions about any particular case. *See* STARR &

MCCORMICK, *supra,* at 16-12. There is only limited time to extract relevant

information during voir dire. Jurors sometimes conceal or are ignorant about their

own biases, and answers are sometimes incomplete, misleading, or false. *See* Ginger,

*supra,* at 1034, 1095; GOBERT & JORDAN, *supra,* at 117, 459. Some attorneys

conduct external investigations to learn more about the members of the venire, but this

is often impossible, impractical, unreliable, or unethical. *See* GOBERT & JORDAN,

*supra,* at 106-27. Although directly relevant information does sometimes become

available—as in cases involving challenges for cause—most of the time even directly

relevant information does not actually disclose the extent of a particular juror's

underlying bias. In other words, the significance of such information usually remains

at least fairly debatable if not entirely ambiguous or immaterial.

With limited information and time, and a lack of any reliable way to determine

the subtle biases of each prospective juror, attorneys tend to rely heavily on

stereotypes and generalizations in deciding how to exercise peremptory challenges.

*See, e.g.,* TED A. DONNER & RICHARD K. GABRIEL, JURY SELECTION: STRATEGY AND

SCIENCE 1-7 to 1-8 (3d ed. 2007); JEFFREY T. FREDERICK, MASTERING VOIR DIRE

AND JURY SELECTION 24 (1995); STARR & MCCORMICK, *supra,* at 17-6. This

phenomenon is endemic. *See, e.g.,* STARR & MCCORMICK, *supra,* at 16-7 ("Since

widely-accepted, strongly-fixed, deeply-rooted stereotypes allow speedy evaluations

and judgments, and since the legal system constantly places lawyers in situations that

require them to exercise peremptory challenges quickly, demographic stereotypes have become the obligatory foundation for decisionmaking in jury selection."). The precise way that stereotypes or generalizations are used, however, depends upon the resources and sophistication of each trial attorney.

The majority of attorneys rely on instinct, lore, and anecdotal experience—used in combination with whatever information about prospective jurors is obtained prior to and during voir dire—to guide the use of peremptory challenges. *See* GOBERT & JORDAN, *supra*, at 77; STARR & MCCORMICK, *supra*, at 7-6. These attorneys tend to rely heavily on speculative and unfounded stereotypes and generalizations that masquerade as insight or wisdom; indeed, the "old lawyer's lore" passed down from one generation to the next is rampant with such dubious and sweeping declarations. STARR & MCCORMICK, *supra*, at 5.1-5; *see, e.g.,* ROBERT A. WENKE, THE ART OF SELECTING A JURY 70-71, 76-77, 84-85 (1979) (recommending that civil plaintiffs seek out "[r]elatively unskilled government workers" and that civil defendants seek out "[c]hildless persons," among other unsupported generalizations); Frederick, *supra*, at 23 (collecting examples). Often this approach involves the application of a simple and straightforward stereotype concerning a single demographic characteristic. *See, e.g.,* STARR & MCCORMICK, *supra*, at 5.1-4 ("Williams . . . reduced [the jury pool] by following his own guidelines: 'strike Scandinavians (too pro-government), keep Irish (pro-underdog)' . . . ." (quoting Evan Thomas, *The Man to See: Edward Bennett Williams—Legendary Trial Lawyer, Ultimate Insider*, WASHINGTON MONTHLY (Oct.

1991))). Sometimes the attorney instead relies on stereotypes or generalizations concerning a synthesis of multiple characteristics. *See, e.g.,* WENKE, *supra,* at 76 ("Older members of minority groups tend to be conservative and prosecution-minded if they have had longtime stable careers."); *id.* at 69 ("[S]eek jurors who identify with your client, who tend to have similar characteristics."); *see also* ABBOTT, *supra,* at 12 (same).

Attorneys with more resources and greater sophistication have gone from using simplistic old lawyer's lore to using jury consultants and applying social science methods to jury selection. The field of jury consultation emerged in the 1970s and grew dramatically in the 1980s and 1990s as various methods and principles of social psychology were applied to trial strategy with apparent success. *See* STARR & MCCORMICK, *supra,* at 5.1-13 to 5.1-36; DONNER & GABRIEL, *supra,* at 5-6 to 5-11. Jury consultants now use a variety of techniques to assist trial attorneys in jury selection, including community surveys, mock juries, and focus groups. *See, e.g.,* STARR & MCCORMICK, *supra,* at 7-1 to 16-32; GOBERT & JORDAN, *supra,* at 78. Based on some or all of these various methods, jury consultants usually develop a "statistical profile" to assist the trial attorney specifically in the exercise of peremptory challenges. STARR & MCCORMICK, *supra,* at 16-3 (noting that this statistical profile is "[o]ne of the primary reasons trial attorneys hire jury/trial consultants"); GOBERT & JORDAN, *supra,* at 89; *see also* Ginger, *supra,* at 1106 (providing example of model juror profile for hypothetical police misconduct case).

The statistical profile often is complex and reflects the synthesis of a number of demographic and other characteristics. *See* STARR & MCCORMICK, *supra,* at 7-47 ("Regression analysis, interaction analysis, or discriminant analysis are the statistical programs most frequently used to develop these profiles."). The profile will be used to select which jurors to challenge and often will guide the attorney's strategies and questioning during voir dire. *See* GOBERT & JORDAN, *supra,* at 90. Attorneys also sometimes use jury consultants "to evaluate juror nonverbal responses to voir dire questioning and to identify the likely group dynamics of the jury." *Id.* at 456 (footnote omitted). Some attorneys instead try to utilize social science methods on their own and on a smaller scale, without incurring the substantial expense of a professional jury consultant. *See, e.g.,* DONNER & GABRIEL, *supra,* at 6-25; GOBERT & JORDAN, *supra,* at 103-105; *see also* ABBOTT, *supra,* at 22 (providing a universal "juror rater" for practitioners to use in any case based on "an ambitious effort to obtain systematically collected social science data on American values and characteristics").

Attorneys who employ these social science methods still rely heavily on stereotypes or generalizations. Judgments made about each individual prospective juror are based on information collected about other individuals. In other words, each prospective juror is presumed to be similar in relevant respects to those individuals who contributed to the available statistical data and possessed some of the known characteristics of the prospective juror. *See, e.g.,* ABBOTT, *supra,* at 58. Although

19

these generalizations are based on more than mere intuition or anecdote, they remain speculative as applied to any particular prospective juror. Further, a great deal of judgment must be exercised in collecting relevant data (e.g., whom to ask, what to ask, and how to ask it), in deciding how to interpret the data, and also in applying the results. *See* STARR & MCCORMICK, *supra*, at 5.1-17; ABBOTT, *supra*, at 78; DONNER & GABRIEL, *supra*, at 6-24. It is perhaps not surprising then to find that "empirical studies testing the predictive value of scientific jury selection have produced inconclusive findings." Franklin Strier & Donna Shestowsky, *Profiling the Profilers: A Study of the Trial Consulting Profession, Its Impact on Trial Justice, and What, if Anything, To Do About It*, 1999 WIS. L. REV. 441, 458-64 (discussing and collecting studies); *see also* Dru Stevenson, *Jury Selection and the Coase Theorem*, 97 IOWA L. REV. 1645, 1653 n.38 (2012) (same); Reid Hastie, *Is Attorney-Conducted Voir Dire an Effective Procedure for the Selection of Impartial Juries?*, 40 AM. U. L. REV. 703, 718-20 (1991) (same).

In sum, attorneys using a wide variety of approaches to jury selection all rely heavily on stereotypes and generalizations to guide the use of peremptory challenges, in an attempt to obtain the most favorable jury possible in any given case. Rough and rapid judgments about prospective jurors are made based on whatever characteristics are observable or otherwise known and which the attorney believes are relevant in some way. Prospective jurors are then excused based solely on such superficial judgments, notwithstanding the fact that whatever directly relevant information is

available either provides no indication that the prospective juror is unqualified or provides some indication that is only fairly debatable at best.

### 3. Racial Discrimination in Peremptory Challenges

Unsurprisingly, peremptory challenges often are motivated by racial stereotypes and generalizations. The perception of race still heavily influences many social observations and judgments in our society. Regardless of whether an attorney uses intuition, old lawyer's lore, or jury consultation, we should not be surprised to find that the resultant judgments about prospective jurors are based in whole or in part on race. Indeed, the existing evidence discussed below shows that racial discrimination is prevalent in the use of peremptory challenges in Washington and elsewhere, and our current legal framework necessarily fails to address this problem.

Peremptory challenges can be racially discriminatory in numerous ways. First, a peremptory challenge can be based on a straightforward, race-based stereotype or generalization. For example, an attorney might seek to remove a prospective juror because of an antiquated belief that a member of the prospective juror's racial group must be or probably is unable to adequately serve as a juror due to insufficient integrity, intelligence, or judgment. *See, e.g., Norris v. Alabama*, 294 U.S. 587, 598-99, 55 S. Ct. 579, 79 L. Ed. 1074 (1935); *Neal v. Delaware*, 103 U.S. (13 Otto) 370, 402, 26 L. Ed. 567 (1880) (Field, J., dissenting). As another example, an attorney might challenge a prospective juror due to a belief that a member of the prospective juror's racial group necessarily or probably has a certain belief, opinion, or value that

21

renders the prospective juror relatively unfavorable. *See, e.g., Howard v. Senkowski,* 986 F.2d 24, 25 (2d Cir. 1993) (prosecutor believed that the fact that prospective jurors were black "made them sympathetic to the defendant"); *McCormick v. State,* 803 N.E.2d 1108, 1111 (Ind. 2004) (prosecutor speculated that prospective juror would find it difficult passing judgment against a member of his own racial group); Frederick, *supra,* at 23-24. Straightforward racial stereotypes also can involve a synthesis of multiple characteristics, only one of which is race. *See Leahy v. Farmon,* 177 F. Supp. 2d 985, 997 (N.D. Cal. 2001) ("My experience is that native Americans who are employed by the tribe are . . . somewhat suspicious of the system."); *Payton v. Kearse,* 329 S.C. 51, 55-56 & n.1, 495 S.E.2d 205 (1998) (party using peremptory challenge against alleged "'redneck'" was "sterotyp[ing] a subgroup of the white race"); *Owens v. State,* 531 So. 2d 22, 24 (Ala. Crim. App. 1987) (stereotype involving age, single status, and race). Various straightforward racial stereotypes and generalizations remain prevalent today. *See* STARR & McCORMICK, *supra,* at 17-4 ("Given the strength of the beliefs people, including trial lawyers, assign for the effect of race on decision-making, it is nearly impossible to convince them that in many cases, race plays a far less significant role than expected."); Alafair S. Burke, *Prosecutors and Peremptories,* 97 IOWA L. REV. 1467, 1468 & n.2 (2012).

Second, a peremptory challenge can be based on a simple or complex statistical juror profile that incorporates race as an indicator of favorability. It appears to be common practice today to track race as a relevant demographic characteristic in

developing statistical juror profiles. *See* STARR & MCCORMICK, *supra*, at 7-6, 7-35, 17-19; DONNER & GABRIEL, *supra*, at 6-23; GOBERT & JORDAN, *supra*, at 82; ABBOTT, *supra*, at 13, 48-50. Race currently does correlate, at least roughly, to various beliefs, opinions, and values held in our society. *See, e.g.,* STARR & MCCORMICK, *supra*, at 16-23, 17-5 (noting for example that "people of color are twice as likely as whites to believe that 'race relations in the United States are poor'"); *see also* Matt Haven, *Reaching* Batson*'s Challenge Twenty-Five Years Later: Eliminating the Peremptory Challenge and Loosening the Challenge for Cause Standard*, 11 U. MD. L.J. RACE, RELIGION, GENDER & CLASS 97, 97 (2011). But the modern view among at least some jury consultants is that in jury selection today, "[r]ace almost never profiles, except in cases specifically referring to racial issues" and "[r]ace seems to be an ever decreasing factor in determining reactions to case issues." STARR & MCCORMICK, *supra*, at 16-3; *see also* DONNER & GABRIEL, *supra*, at 1-6 to 1-7. Race no longer regularly "profiles" in part because jury consultants have begun identifying other characteristics in each case—primarily life experiences—they believe to be far more predictive of whether a prospective juror is favorable. STARR & MCCORMICK, *supra*, at 16-3, 17-4 to 17-6. At the same time, attorneys remain skeptical and resistant to the notion of excluding race from consideration as a potential indicator of favorability. *See id.* at 7-6, 17-4; *cf.* ABBOTT, *supra*, at 2 (noting prior "widespread agreement that demographic and social characteristics . . . are likely to determine values which affect the responses of jurors

to the case"). Further, most attorneys do not have the time or resources to have consultants identify the particular life experiences that might be more effective at indicating favorability in a given case. *See id.* at 16-6 to 16-8, 16-21 to 16-26; GOBERT & JORDAN, *supra,* at 105; Stevenson, *supra,* at 1654 n.39; *cf.* ABBOTT, *supra,* at 49 (race included in universal profiler). The use of race in statistical juror profiling remains an ongoing practice.

Third, a peremptory challenge can be based on the desire to obtain a particular racial dynamic on the jury as a whole. *See, e.g., Miesner v. State,* 665 So. 2d 978, 980-81 (Ala. Crim. App. 1995) (prosecutor "'wanted a balanced jury'" and thus "'wanted some white people on the jury'" (some emphasis omitted)). Although the common "tendency in selecting a jury is to consider each juror on his or her individual merits," the more sophisticated attorneys, and particularly those employing social science methods, also consider group dynamics. GOBERT & JORDAN, *supra,* at 451, 456; *see* Frederick, *supra,* at 155-57. But when an attorney uses a peremptory challenge in an attempt to obtain a particular group dynamic with regard to race, the attorney is engaging in a distinct form of racial discrimination.

Finally, a peremptory challenge can be based on unconscious racial bias. In other words, race can subconsciously motivate a peremptory challenge that the attorney genuinely believes is race-neutral. *See* lead opinion at 13-17. As one example among many, an attorney might exercise a peremptory challenge based solely on his "gut feeling," unaware that the race of the challenged juror caused or

substantially contributed to the gut feeling. As another example, an attorney might believe that the basis of her challenge is a prospective juror's answer to a particular question, unaware that she would neither have asked the question nor have brought the challenge against that prospective juror had he been of a different race. In such circumstances, the challenge is motivated at least in part by underlying racial bias, and thus, is racially discriminatory.

The racially discriminatory use of peremptory challenges is occurring regularly throughout this state. Even after *Batson,* substantial portions of lawyers, judges, and court personnel throughout Washington observed that, to varying degrees, attorneys "use peremptory challenges systematically to eliminate minorities from juries." WASHINGTON STATE MINORITY AND JUSTICE TASK FORCE, FINAL REPORT 45, 52, 216, 218, 220, 226-27, 234, 240 (Dec. 1990), *available at* http://www.courts.wa.gov/committee/pdf/TaskForce.pdf. Most concerning is that a full 42.6 percent of surveyed lawyers reported that prosecutors in Washington either "sometimes" or "often" use peremptory challenges to systematically exclude minorities from juries. *See id.* at 226. This collective observation cannot be brushed aside and is not surprising given the degree to which racial stereotypes and generalizations are relied upon in jury selection generally and in the use of peremptory challenges specifically. It would be naïve to think that trial attorneys have abandoned all race-related lore or completely excluded race as a factor when applying social-scientific methods to jury selection. *See, e.g.,* Michael E. Withey, *The*

*Importance of Connecting with the Jury, in* THE JURY: LATEST TECHNIQUES FOR

SELECTING AND PERSUADING JURIES 2, 2-3 (Wash. State Trial Lawyers Ass'n,

Continuing Legal Educ. May 16, 2001) (on file with the Washington State Law

Library) (set of legal education materials provided to lawyers throughout Washington

explaining the concept of a jury survey and noting that "[m]ost surveys will test

attitudes toward issues by certain demographic characteristics, including gender, age,

[and] race"). Race continues to play a significant role in the use of peremptory

challenges in Washington.

Evidence from other jurisdictions confirms that racial discrimination in the use

of peremptory challenges is widespread. Numerous studies in other states have

consistently and uniformly shown a significant influence of race on the use of

peremptory challenges in actual practice. Racial disparities in peremptory usage have

been documented in the courts of Alabama, Georgia, Illinois, Louisiana, North

Carolina, Pennsylvania, and Texas. *See* EQUAL JUSTICE INITIATIVE, ILLEGAL RACIAL

DISCRIMINATION IN JURY SELECTION: A CONTINUING LEGACY 14 (2010) (noting

studies finding substantial racial disparities in peremptory usage in Alabama, Georgia,

and Louisiana); Catherine M. Grosso & Barbara O'Brien, *A Stubborn Legacy: The*

*Overwhelming Importance of Race in Jury Selection in 173 Post-*Batson *North*

*Carolina Capital Trials*, 97 IOWA L. REV. 1531, 1538-40 & n.55 (2012) (discussing

studies of peremptory challenge usage finding racial disparities in Illinois, Louisiana,

North Carolina, Pennsylvania, and Texas). Many of these studies have found that

even after controlling for numerous other potentially relevant factors, race remains highly determinative of peremptory usage. *See* GROSSO & O'BRIEN, *supra,* at 1533, 1547, 1552-54 (review of capital trials in North Carolina finding that even after controlling for 65 other variables, "a black venire member had 2.48 times the odds of being struck by the state as did a venire member of another race"); STARR & MCCORMICK, *supra,* at 17-7 to 17-8 (discussing a comprehensive review of criminal trials in Dallas finding widespread racial disparities and also finding that "'no factor reduced the importance of race'" (quoting Steve McGonigle et al., *Jurors' Race A Focal Point For Defense: Rival Lawyers Reject Whites at Higher Rate,* THE DALLAS MORNING NEWS, Jan. 24, 2006)); David C. Baldus et al., *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis,* 3 U. PA. J. CONST. L. 3, 46, 60, 72, 121 (2001) (review of Philadelphia capital murder cases finding that even after controlling for numerous variables "venire member race was a major determinant in the use of peremptories").

Laboratory studies provide even further evidence that racial discrimination underlies the use of peremptory challenges. In one recent study, attorneys were presented with a criminal trial scenario along with descriptions of two prospective jurors and were instructed to decide as a prosecutor which of the two prospective jurors to challenge peremptorily. *See* Samuel R. Sommers & Michael I. Norton, *Race-Based Judgments, Race-Neutral Justifications: Experimental Examination of Peremptory Use and the* Batson *Challenge Procedure,* 31 LAW & HUM. BEHAV. 261,

266-67 (2007). In one condition, the first prospective juror was depicted as white and the second prospective juror as black; in a second condition, the races were reversed but the underlying information remained the same. *Id.* When the first profile was black, attorneys chose to challenge that prospective juror 79 percent of the time; when that same profile was white, attorneys challenged that prospective juror only 43 percent of the time. *Id.* at 267. Likewise, when the second profile was depicted as black, attorneys challenged that prospective juror 57 percent of the time; when that same profile was white, attorneys challenged that prospective juror only 21 percent of the time. *Id.* Thus the attorneys, acting as prosecutors, were significantly more likely to challenge a juror profile when it was depicted as a black prospective juror as opposed to a white prospective juror, all else being equal. The experimenters also found similar effects among college students and law students. *Id.* Further, the experimenters asked each participant to explain his or her choice of whom to strike. A full 96 percent of participants cited relevant underlying substantive information from either profile as "their most important justification," and only 8 percent of the attorneys (and an even smaller proportion of college students and law students) cited race as being influential at all. *Id.* at 267-68 (explaining that respondents "cited as their most important justification either Juror #1's familiarity with police misconduct or Juror #2's skepticism about statistics"). The experimenters rightly concluded that their study "provides clear empirical evidence that a prospective juror's race can influence peremptory challenge use and that self-report justifications are unlikely to

be useful for identifying this influence . . . ." *Id.* at 269. The experimenters also noted that the findings "are strikingly similar in direction as well as magnitude to conclusions of archival analyses of real peremptory use." *Id.* (citations omitted). Other laboratory studies have found similar effects of race on the use of peremptory challenges. *See* GROSSO & O'BRIEN, *supra*, at 1536-38 (discussing studies).

Case-by-case adjudication and appellate review under *Batson* cannot effectively combat the widespread racial discrimination that underlies the use of peremptory challenges throughout this state, and thus, such racial discrimination will continue unabated under our current framework. *Batson* requires a complaining party to make a prima facie case of unlawful discrimination, and whenever such a prima facie case has been made, *Batson* requires the proponent of the challenge to identify his or her reasons. *See* lead opinion at 9. If the proponent's alleged reasons are lawful, the trial court then must adjudicate whether the challenge is in fact unlawfully discriminatory, and that determination will be reversed on appeal only if it is clearly erroneous. *See* lead opinion at 9-10, 22-23. For numerous reasons, this framework has been and will continue to be largely ineffective at combating racial discrimination in the use of peremptory challenges in Washington.

First, many racially discriminatory peremptory challenges remain unchallenged and are never subjected to judicial review. In some such cases, the presence of racial discrimination remains entirely imperceptible to the opposing party and trial judge, and thus, no objection is raised and the issue is never addressed. Even when racial

discrimination becomes sufficiently apparent to warrant an objection, opposing parties often decide not to object. *See* STARR & MCCORMICK, *supra*, at 17-15, 17-18, 17-19 (reporting results of a nationwide survey of trial attorneys, including Washington attorneys); EQUAL JUSTICE INITIATIVE, *supra*, at 6. Some attorneys are concerned about alienating other prospective jurors or upsetting opposing counsel or the judge; others do not have strong feelings about keeping the challenged prospective juror on the venire and thus accept the peremptory challenge; still others will not raise an objection unless the racial discrimination is already sufficiently obvious to satisfy a demanding trial judge; and some attorneys do not raise a *Batson* objection because they are engaging in racial discrimination themselves. *See* STARR & MCCORMICK, *supra*, at 17-18 to 17-19 ("'What's good for the goose is good for the gander. We're taking off one race as fast as they can take off the other. If we challenge them, they will challenge us.'" (quoting survey answers)). Trial judges overseeing such cases might remain unaware of the appearance of racial discrimination or might simply want to avoid inviting substantial complications and administrative costs when no party has objected and judicial review probably would be fruitless. All of this remains deeply concerning, however, because racial discrimination in the use of peremptory challenges harms not only litigants but also "the excluded jurors and the community at large." *Powers v. Ohio*, 499, U.S. 400, 406, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). Under our current framework, many racially discriminatory peremptory challenges evade review entirely.

Second, even if an objection is made, plausible race-neutral reasons are quite easy to conjure up in any given case, regardless of whether the peremptory challenge is actually based on racial discrimination and regardless of whether such racial discrimination is conscious or unconscious. *See, e.g.*, STARR & MCCORMICK, *supra*, at 17-11 (quoting one forthright prosecutor as saying, "Very frankly, any attorney worth his salt can make up something to get over a *Batson* challenge. And, literally, [prosecutors] do make it up. We do." (alterations in original) (quoting McGonigle, et al., *supra*); SOMMERS & NORTON, *supra*, at 263 ("Many researchers have demonstrated that people can offer compelling explanations for their behavior even when unaware of the factors—such as race—that are actually influential."). Attorneys are trained to identify distinctions and to provide explanations for conduct. To overcome a *Batson* challenge based on alleged racial discrimination, an attorney merely has to "be careful not to give a reason that also [applies to a prospective juror of another race] against whom [the attorney does] not exercise a peremptory." Nancy S. Marder, Batson *Revisited*, 97 IOWA L. REV. 1585, 1591 (2012); *see also, e.g.*, *People v. Randall*, 283 Ill. App. 3d 1019, 1025-26, 671 N.E.3d 60 (1996) (deriding "the charade that has become the *Batson* process," noting that "[t]he State may provide the trial court with a series of pat race-neutral reasons," and citing numerous cases involving a slew of such reasons). Proffered reasons sometimes involve subtle observations about a prospective juror's appearance or demeanor, which are easily alleged but often extremely difficult to scrutinize. *See* EQUAL JUSTICE INITIATIVE,

31

*supra,* at 18; Marder, *supra,* at 1591-92. Further, race often will be one of many factors actually motivating a challenge, and thus, race-neutral reasons will be readily available to be included in a true but incomplete explanation. *See* SOMMERS & NORTON, *supra,* at 269. It would be naïve to think that attorneys do not rely on readily available and plausible race-neutral reasons to circumvent *Batson.* Under our current framework, plausible race-neutral reasons remain readily available and regularly invoked.

Third, there usually is no way for a trial court to accurately and reliably determine whether a given peremptory challenge is racially discriminatory. As noted above, proffered race-neutral reasons are almost always plausible, but not always real or comprehensive. The circumstances surrounding a given challenge usually will not resolve the inquiry, and trial judges may be hesitant to question the integrity or self-awareness of counsel. *See* lead opinion at 20. Further, social science research tells us that trial judges generally are unable to accurately and reliably determine credibility based on demeanor alone, regardless of their confidence in doing so. *See, e.g.,* Paul Ekman & Maureen O'Sullivan, *Who Can Catch a Liar?,* 46 AM. PSYCHOLOGIST 913, 913-17 (Sept. 1991) (experimenters presented video clips of individual persons describing feelings about a movie each was allegedly watching; trial judges performed only slightly better than chance in determining who was lying about watching the movie, and confidence was not correlated to performance); *see also, e.g.,* Saul M. Kassin, *Human Judges of Truth, Deception, and Credibility: Confident But*

*Erroneous,* 23 CARDOZO L. REV. 809 (2002). In addition, trial courts generally do not have the time or resources to review the record in-depth or to conduct statistical analysis prior to resolving a *Batson* objection. Such a review of the record rarely would provide clarity anyhow. *Cf.* SOMMERS & NORTON, *supra,* at 269 ("We observed bias against Black venire members only when examining decisions made by several participants; indeed, for any given participant, we are unable to determine whether the peremptory was influenced by race or whether the justification provided was valid. Only in the aggregate does evidence of racial bias emerge . . . ."). Under our current framework, trial courts cannot reliably identify individual instances of racial discrimination in the use of peremptory challenges.

Fourth, there is no way for appellate courts to provide sufficiently meaningful review on appeal. An appellate court is in an even worse position than the trial court to determine whether a particular peremptory challenge was racially discriminatory. Although an appellate court can conduct a searching review of the cold record and undertake statistical analysis as appropriate, *see* lead opinion, App. A, such review rarely will provide an answer. Even if the appellate court's searching review uncovers inconsistencies between the race-neutral explanation and the proponent's treatment of other prospective jurors, the comparable characteristics of the other prospective jurors might have escaped not only the notice of the trial court but also the notice of the attorney, who was faced with the complexities and pressures of navigating voir dire and jury selection. It will be difficult if not impossible to determine whether the

attorney overlooked a comparable juror while crafting a post hoc explanation for the challenge or instead, overlooked that same comparable juror when invoking the challenge in the first place. Under our current framework, appellate review remains ineffectual.

Finally, too many unanswered questions remain under *Batson*, which will continue to cause much confusion and impose substantial litigation costs, all without addressing the underlying problem. *See, e.g.*, DONNER & GABRIEL, *supra*, at 23-30 ("Since *Batson* was decided, the trial and appellate courts have struggled with the scope of its application."). For example, it remains unclear exactly which groups are to be protected from discrimination in jury selection. To date, the United States Supreme Court has applied the *Batson* framework only to discrimination "on the basis of race, ethnicity, or sex." *Rivera*, 556 U.S. at 153. The extent to which such protection extends to other groups remains to be determined. *See, e.g.*, DONNER & GABRIEL, *supra*, at 3-17 to 3-18, 23-46 (age, disability, religion); Mary A. Lynch, *The Application of Equal Protection to Prospective Jurors with Disabilities: Will* Batson *Cover Disability-Based Strikes?*, 57 ALB. L. REV. 289 (1993) (disability); Kathryne M. Young, *Outing Batson: How the Case of Gay Jurors Reveals the Shortcomings of Modern Voir Dire*, 48 WILLAMETTE L. REV. 243 (2011) (sexual orientation); Maggie Elise O'Grady, *A Jury of Your Skinny Peers: Weight-Based Peremptory Challenges and the Culture of Fat Bias*, 7 STAN. J. C.R. & C.L. 47 (2011) (weight); Note, *Due*

34

*Process Limits on Prosecutorial Peremptory Challenges,* 102 HARV. L. REV. 1013, 1020 (1989) (noting that "courts have pointedly disagreed" on these issues).

As a second example, it remains unclear how to determine whether a prima facie case has been established, and in particular, how that determination should be reviewed on appeal. The United States Supreme Court has explained that a prima facie case is established whenever the circumstances "permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California,* 545 U.S. 162, 170, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). The Court in *Johnson* emphasized that trial courts should not be "engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." *Id.* at 172, 173. Thus, it would appear that a trial court's discretion is relatively limited at the first step of the *Batson* inquiry: technically, discrimination is inferable any time that the eventual composition of the jury could change in a relevant way as a result of the disputed challenge. But the Court in *Johnson* did not explicitly spell out such a lenient standard, and in dicta we have since interpreted the prima facie case requirement as being more demanding and have emphasized that the trial court's determination at step one of *Batson* is discretionary. *See State v. Thomas,* 166 Wn.2d 380, 397-98, 208 P.3d 1107 (2009); *State v. Hicks,* 163 Wn.2d 477, 490-93, 181 P.3d 831 (2008). Understandably, we have had some difficulty determining the precise outer limits of that discretion, *see State v. Rhone,* 168 Wn.2d 645, 229 P.3d 752 (2010), and such struggles are bound to continue under our current framework with no end in sight, *see,*

35

e.g., *State v. Meredith*, 173 Wn.2d 1031, 275 P.3d 303 (2012) (accepting review "on the issue of the scope of the bright line rule articulated in [*Rhone*]").

As a third example, it remains unclear just how direct or substantial the influence of race must be in order to render a peremptory challenge racially discriminatory under *Batson*. Mere reliance on "statistical support" does not immunize a peremptory challenge from attack, and any attorney using peremptory challenges must "look beyond the surface before making judgments about people that are likely to stigmatize as well as to perpetuate historical patterns of discrimination." *J.E.B.v. Alabama*, 511 U.S. 127, 139 n.11, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). But if a detailed and complex statistical juror profile includes race among a wide variety of other factors, is a resulting challenge necessarily racially discriminatory under *Batson*? What if the attorney would have challenged the same prospective juror even if the prospective juror's race had not matched the complex and otherwise matching profile? Or more generally, what if the attorney has two separate and independently sufficient reasons for the challenge, only one of which is based on race? *See* Kurtis A. Kemper, Annotation, *Adoption and Application of "Tainted" Approach or "Dual Motivation" Analysis in Determining Whether Existence of Single Discriminatory Reason for Peremptory Strike Results in Automatic* Batson *Violation When Neutral Reasons Also Have Been Articulated*, 15 A.L.R.6TH 319 (2012). What if the attorney investigates race but race does not end up as a factor on the eventual statistical profile used? Or what if the attorney considers the potential significance of

36

race in order to identify *other* relevant characteristics that eventually guide her

peremptory usage? *Cf.* STARR & MCCORMICK, *supra*, at 16-25 ("[L]ook at race and

its subcategories and at the case issues to identify any life experience or attitude that

might cause concern in jury selection." (emphasis omitted)). What if, based on a

statistical profile, an attorney focuses some of his voir dire questioning on members of

a particular race, and then unearths compelling race-neutral reasons to challenge some

of them, as predicted by the profile? These questions all reflect the complex nature of

peremptory challenges in actual practice and present difficulties that our current

framework may not be equipped to handle.

As a final example, it remains unclear whether unconscious racial

discrimination is prohibited under *Batson*. *See* lead opinion at 19-20 & n.8.

Unconscious racial discrimination is extremely inequitable, harmful, and unjust—but

also fairly ubiquitous and relatively blameless at an individual level. Unconscious

bias is not easily deterred, because the biased individual is not aware of its presence.

Further, it is nearly impossible for any observer to identify the presence of

unconscious bias in any particular instance. *See, e.g.*, SOMMERS & NORTON, *supra*, at

269. That said, if peremptory challenges based on unconscious racial bias are

prohibited, and if trial courts are made aware of the prevalence of unconscious bias in

general, they might be relatively more likely to scrutinize proffered race-neutral

explanations and to fully appreciate the potential presence of racial discrimination in

the use of peremptory challenges. *See* lead opinion at 21. Still, any gains would be

modest at best. And regardless, the distinction between conscious and unconscious bias would remain largely irrelevant on appeal, because circumstantial evidence of unconscious bias and circumstantial evidence of conscious bias generally is the same evidence, and only in the rarest of cases will a finding of unconscious bias (or lack thereof) be compelled while a finding of conscious bias (or lack thereof) is not. It should be clear by now that unconscious bias is simply one problem among many. Focusing on any such secondary problem simply distracts from the overarching need to abolish peremptory challenges entirely.

In sum, our current framework will continue to engender confusion and needless administrative and litigation costs, while racial discrimination in the use of peremptory challenges—both conscious and unconscious—continues unabated.

### 4. *The Additional Costs of Peremptory Challenges*

The use of peremptory challenges is harmful in this state not only because of the ongoing racial discrimination involved, but also because of a wide variety of other resulting injustices—with no substantiated benefits. In particular, the use of peremptory challenges contributes to the historical and ongoing underrepresentation of minority groups on juries, broadly increases administrative and litigation costs, results in less effective and less socially beneficial juries, and amplifies resource disparities in litigation. On the other hand, the use of peremptory challenges produces no substantiated systemic benefits.

First, the use of peremptory challenges contributes to the underrepresentation of minority groups on juries, even in the absence of purposeful discrimination. Racial minorities in particular are underrepresented on juries for a wide variety of reasons, including the use of peremptory challenges. *See, e.g.,* HIROSHI FUKURAI ET AL., RACE AND THE JURY: RACIAL DISENFRANCHISEMENT AND THE SEARCH FOR JUSTICE 3-4, 34, 40-42 (1993) (collecting studies and identifying various causes that have a "cumulative effect"); WASHINGTON STATE CENTER FOR COURT RESEARCH, JUROR RESEARCH PROJECT: REPORT TO THE WASHINGTON STATE LEGISLATURE 5-6, 18 (Dec. 24, 2008) (showing underrepresentation of various racial minorities in jury pools in Clark, Des Moines, and Franklin counties), *available at* http://www.courts.wa.gov/wsccr/docs/Juror%20Research%20Report%20Final.pdf. This ongoing underrepresentation reflects a history of complete exclusion from jury service and subsequent resistance to efforts at inclusion. *See Rosencrantz,* 2 Wash. Terr. at 278 (Turner, J., dissenting) (noting that "trial by jury at common law" required "'free and lawful men'" as jurors, and "if he be a slave or bondman, this is defect of liberty"); James Forman, Jr., *Juries and Race in the Nineteenth Century,* 113 YALE L.J. 895, 910 (2004) ("It is believed that 1860 was the first year in which African Americans served on juries, in either the North or the South."); Fukurai et al., *supra,* at 14-15 ("Over the next 100 years, litigated cases overwhelmingly viewed blacks as inferior, and this inferiority was ensured by structural conditions imposed in the jury selection process to limit the number of black jurors."). More recently, the

Washington State Jury Commission reported that there remains in Washington "a perception that jury service has been reserved for certain segments of our society," which "increases alienation of the excluded segments and increases resentment by those who [believe] they are summoned too many times." WASHINGTON STATE JURY COMM'N, REPORT TO THE BOARD FOR JUDICIAL ADMINISTRATION 3 (July 2000), *available at* http://www.courts.wa.gov/committee/pdf/Jury_Commission_Report.pdf. The commission concluded that "special efforts should be made to increase participation in jury service by sectors of society that traditionally have not participated fully, particularly young people and minority communities." *Id.* Yet the use of peremptory challenges only contributes to the recognized and continuing underrepresentation of minority groups. Each peremptory challenge leveled against a member of a minority group has a relatively greater exclusionary effect because each such challenge removes a greater percentage of that minority group from jury service. Further, many characteristics or life experiences that attorneys perceive as unfavorable, but which do not render a prospective juror unqualified for service, may be relatively more common (or seen as more common) among various minority groups. *See, e.g.,* GROSSO & O'BRIEN, *supra,* at 1541 & n.63 (noting that striking all persons with a relative in prison could disproportionately exclude racial minorities). Especially when combined with ongoing racial discrimination, these factors show that peremptory challenges are a powerful contributor to the ongoing underrepresentation of minority groups on juries.

Second, peremptory challenges impose substantial administrative and litigation costs. More prospective jurors must be called upon to appear for service, disrupting the lives of many who never actually serve on a jury. Litigants spend much time and money determining how best to exercise peremptory challenges, not in order to ensure the constitutional requirement of an impartial jury, but rather to obtain as favorable a jury as possible. *See, e.g.,* Stevenson, *supra,* at 1654 n.39 (noting the exorbitant cost of jury consultation). Further, courts and litigants continue to spend inordinate amounts of time and money, both at trial and on appeal, adjudicating myriad claims and arguments under the generally unwieldy and ineffective *Batson* framework. Allowing the use of peremptory challenges imposes all of these costs on our justice system.

Third, peremptory challenges result in juries that are less effective and less productive. Allowing the use of peremptory challenges tends to exclude people with diverse viewpoints and experiences who are qualified to serve as jurors. *See, e.g.,* GOBERT & JORDAN, *supra,* at 272. Yet inclusion and diversity should be considered extremely important goals of the jury system at a systemic level, in addition to the fundamental requirement of impartiality. *See* WASHINGTON STATE JURY COMM'N, *supra,* at 3. As the lead opinion rightly points out, such inclusion and diversity is highly beneficial, advancing fairness and the appearance of fairness, and promoting more effective and reflective juries. *See* lead opinion at 17-18; *see also* Marder, *supra,* at 1604 & nn.119-21 ("[T]hey can correct each other's mistaken notions,

broaden each other's perspectives, and suggest different ways of looking at the evidence."). Increased diversity and inclusion on juries also has the potential to motivate civic engagement in the community. *See* Andrew E. Taslitz, *The People's Peremptory Challenge and* Batson: *Aiding the People's Voice and Vision Through the "Representative" Jury*, 97 IOWA L. REV. 1675, 1709-10 (2012) (discussing "one of the largest studies on juries and democracy"). Allowing the use of peremptory challenges takes us further away from the important goals of inclusion and diversity.

Fourth, the use of peremptory challenges amplifies underlying resource disparity among litigants in a way that brings fundamental fairness into question. This problem arises because thorough jury consultation is quite expensive and available only to wealthy litigants. *See, e.g.*, Strier & Shestowsky, *supra*, at 474-76. Although the actual efficacy of jury consultation is somewhat dubious, insofar as even a modest advantage can be obtained in the use of peremptory challenges, the result is a potentially slanted jury and a widening of "the already-substantial advantage of the wealthy." *Id.* at 463-64, 474. Such an imbalance in jury selection is especially antithetical to the notion of an impartial jury and "creates an untoward public perception of the jury being manipulated by psychological devices, in essence, high-tech jury tampering." *Id.* at 472-73 (footnote omitted); *see also* STARR & MCCORMICK, *supra*, at 5.1-34; GOBERT & JORDAN, *supra*, at 118, 453. Normally, resource disparity affects each side's ability to convince the adjudicator of its position,

not the ability to select the adjudicator in the first place. The latter is a far more fundamental, and in this context an entirely avoidable, problem.

In stark contrast to the numerous and substantial harms resulting from the use of peremptory challenges, the procedure has no material benefits. Various benefits have been identified in theory, but these alleged benefits remain unsupported, specious, or de minimis and clearly outweighed by related costs. *See, e.g.*, Morris B. Hoffman, *Peremptory Challenges Should Be Abolished: A Trial Judge's Perspective*, 64 U. CHI. L. REV. 809, 812-13 (1997) ("Although there is no shortage of academic and judicial generalizations about the importance of the peremptory challenge, there have been remarkably few efforts to articulate precisely why the peremptory challenge is so important." (footnote omitted)).

The primary benefit alleged to result from the use of peremptory challenges is jury impartiality. But as already discussed, attorneys use peremptory challenges to exclude unfavorable jurors, not to obtain an impartial jury. Peremptory challenges are used to remove prospective jurors who are qualified but who the attorney believes will be relatively unfavorable in what is probably a close case. This has nothing to do with furthering impartiality in our justice system.

Moreover, peremptory challenges are generally ineffective even for the adversarial purpose of excluding unfavorable jurors. Regardless of their intentions, and notwithstanding attorneys' collective confidence in their own ability to identify unfavorable or secretly partial jurors, studies of actual peremptory usage show that

attorneys generally are ineffective at doing so, and laboratory experiments confirm

that finding. *See* Raymond J. Broderick, *Why the Peremptory Challenge Should Be*

*Abolished,* 65 TEMP. L. REV. 369, 413 (1992) (citing studies); Marder, *supra,* at 1596-

98 (same).

In one preeminent study of actual peremptory usage in real criminal trials,

prospective jurors who were removed by peremptory challenge were then formed into

shadow juries to observe the trials from which they had been excused. *See* Hans

Zeisel & Shari Seidman Diamond, *The Effect of Peremptory Challenges on Jury and*

*Verdict: An Experiment in a Federal District Court,* 30 STAN. L. REV. 491, 498-500

(1978). The experimenters were then able to determine whether the attorneys had

reliably excused those jurors who would have voted against them entering

deliberations. *See id.* at 513-18. The results were "not impressive." *Id.* at 517.

Overall, "attorney performance was highly erratic," with substantial fluctuations from

one case to the next. *Id.* In the aggregate, prosecutors "made about as many good

challenges as bad ones," defense counsel fared only "slightly better," and the results

brought into question "the role of peremptory challenges in furthering the

constitutionally prescribed goal of trial by an impartial jury." *Id.* at 517-18.

In another prominent experiment, a mock criminal trial was first conducted and

then numerous practicing attorneys (primarily prosecutors and defense counsel asked

to take up their usual roles) were presented with video of the voir dire. *See* Norbert L.

Kerr et al., *On the Effectiveness of Voir Dire in Criminal Cases with Prejudicial*

*Pretrial Publicity: An Empirical Study*, 40 AM. U. L. REV. 665, 672-79 (1991). The attorneys then reported "how likely they were to use a peremptory challenge" on individual prospective jurors, estimated "which way the juror[s] would lean in the trial," and then were asked to guess how many of their own predictions were correct. *Id.* at 677-78. The attorneys reported that the simulation was fairly realistic. *See id.* at 679. But a comparison of attorney ratings to actual juror performance in the mock trial found that "defense attorneys would have done no worse in exercising their peremptory challenges had they simply flipped coins," while prosecutors' ratings "were weakly, but only marginally, correlated with juror behavior," and both groups "grossly overestimated their actual rate of success." *Id.* at 685, 688-89.

These results should not be surprising. As noted, most lawyers rely on intuition, lore, and anecdotal experience in exercising peremptory challenges. But in practice attorneys rarely if ever can actually confirm the effectiveness of their decisions concerning peremptory challenges. Thus, anecdotal experience and lore in this context are based on nothing more than intuition, which is entirely arbitrary, erratic, and unreliable without any sort of regular experiential validation. *See* Marder, *supra*, at 1596-97. Over time, well-established psychological tendencies—such as confirmation bias (the tendency to look for confirmation but not falsification of our hypotheses) and selective information processing (the tendency to readily accept confirming evidence but devalue contradictory evidence)—likely entrench attorneys' preexisting biases, including closely held racial stereotypes and generalizations, and

45

give attorneys false confidence in the effectiveness of their decisions concerning peremptory challenges. *See, e.g.,* Burke, *supra,* at 1480-81.

Even the use of jury consultation shows only mixed results, probably because of the various subjective judgments that must be made and the unreliability of using superficial statistical analysis to make individual judgments about complex human beings. *See supra,* pp. 20-21. And insofar as jury consultation actually can provide a modicum of relative advantage to a litigant, it remains available only to the most wealthy, and thus, works against fairness and impartiality rather than for it.

The notion that impartiality is furthered by allowing litigants to exercise arbitrary and unsupported juror challenges, based on nothing more than whim or generalization, is a farce. We must recognize that it is difficult if not impossible to detect juror bias except in clear cases, that most biases do not render jurors unqualified, and that the solemnity of the proceedings and substance of deliberations will help to ensure just verdicts from our juries. *See* Marder, *supra,* at 1601-06; DONNER & GABRIEL, *supra,* at 10-18; Taslitz, *supra,* at 1709-10. If there is sufficient evidence that a juror is unqualified, that evidence should be presented to the trial court and ruled upon. Otherwise, the juror should be allowed to serve.

The remaining arguments in support of peremptory challenges fare no better. For example, some have argued that the peremptory challenge "provides a ready corrective for errors by a judge in refusing to grant a challenge for cause." GOBERT & JORDAN, *supra,* at 217. Yet a trial judge refusing to grant a challenge for cause

46

abuses his or her discretion only if the juror's partiality is abundantly clear, which will be relatively rare, and an abuse of discretion in such circumstances will be rarer still. If appropriate, the standards governing challenges for cause can be addressed directly. But allowing litigants to make unsupported and arbitrary challenges to prospective jurors in order to avoid the mere potential for unreasonable decisions by our trial courts would be senseless.

Others have seen potential value in peremptory challenges as a way to "remove a juror whom [the attorney] has offended by a probing voir dire or by an unsuccessful challenge for cause . . . ." Ginger, *supra*, at 1054 n.16. But this argument assumes that attorneys must alienate prospective jurors in order to conduct effective voir dire, which is false. Any relevant concerns can be adequately addressed with questioning from the trial court, more delicate questioning or ingenuity from the attorneys, or proceedings outside the presence of the jury, when appropriate. Regardless, both sides remain on equal footing, and the attorneys can be expected to effectively navigate the process. Even if an attorney happens to alienate a prospective juror during voir dire, an alienated juror is not necessarily biased to any material degree.

Similarly, some have noted that allowing peremptory challenges permits "attorneys to choose jurors about whom they feel comfortable," thus allowing the attorneys to be more effective advocates. GOBERT & JORDAN, *supra*, at 272. But someone who works as a trial advocate should be able to overcome performance anxiety, and any subtle increase in attorney discomfort in a given case is of no

moment. Again, both sides remain on equal footing, and attorneys can be expected to advocate effectively—even before jurors whom they perceive as hostile.

Still others have advocated for peremptory challenges on the ground that parties are "consequently more likely to be accepting of the jury's verdict." GOBERT & JORDAN, *supra*, at 271. But allowing causal challenges provides litigants more than enough involvement in jury selection and adequately ensures fairness and impartiality. The argument also ignores that peremptory challenges interfere with the appearance of fairness in numerous respects, are essentially capricious, and engender disrespect for the legal system in part due to the ongoing presence of racial discrimination and underrepresentation of minority groups on juries. *See, e.g.*, EQUAL JUSTICE INITIATIVE, *supra*, at 28-30; Marder, *supra*, at 1609 & n.144; James H. Coleman, Jr., *The Evolution of Race in the Jury Selection Process*, 48 RUTGERS L. REV. 1105, 1108 (1996); WASHINGTON STATE JURY COMM'N, *supra*, at 3.

Yet another argument in favor of peremptory challenges is that without them attorneys will spend more time asserting and arguing causal challenges, thus increasing administrative and litigation costs. But attorneys already have more than enough incentive to argue causal challenges whenever possible, in order to conserve the limited number of peremptory challenges available to them. Further, attorneys are able to raise causal challenges only when there is some objective reason to believe that a juror cannot be impartial, and trial courts can easily control the process to avoid unnecessary costs and delays. This argument also ignores the relatively greater costs

48

that peremptory challenges impose, including the need to call more prospective jurors who never serve, the needless time and money litigants spend on determining how to exercise peremptory challenges, and the ongoing costs of litigating the *Batson* framework.

A final argument in favor of peremptory challenges is that they prevent extremists from getting onto juries and thus, avoid more hung juries and the need for costly retrials. But true extremists are excused for cause if there is evidence to establish their extremism, and if such extremism remains hidden, the unreliable and inaccurate use of peremptory challenges will fare no better at removing the extremism from the jury. Moreover, the solemnity of the proceedings and the substance of deliberations might help to overcome the initial presence of extremism on the jury. In any event, hung juries are relatively rare, notwithstanding the fact that most trials present close cases. *See* PAULA L. HANNAFORD-AGOR ET AL., ARE HUNG JURIES A PROBLEM? 25 (National Center for State Courts, National Institute of Justice, 2002) (finding average hung jury rate of 6.2 percent in 30 jurisdictions across the United States), *available at*
http://ncsc.contentdm.oclc.org/cdm/singleitem/collection/juries/id/27/rec/2.

In sum, the substantial costs of allowing the use of peremptory challenges are numerous, well-established, and deeply concerning, while the alleged benefits are unsupported, specious, or de minimis.

5. *A Brief History of the Peremptory Challenge*

The case for abolishing peremptory challenges becomes even more compelling after considering the origin of the procedure and its history in Washington.

The peremptory challenge first appeared in England during the 13th century. *See* William T. Pizzi & Morris B. Hoffman, *Jury Selection Errors on Appeal*, 38 AM. CRIM. L. REV. 1391, 1412 (2001); *see also* Hoffman, *supra*, at 817-19. Historians believe that the practice originated in English criminal trials because causal challenges made by the King were deemed royally infallible; in response, criminal defendants were provided with a reasonable number of challenges of their own for which no cause would be required. *See* Pizzi & Hoffman, *supra*, at 819; Broderick, *supra*, at 371-72; Pizzi & Hoffman, *supra*, at 1412. Others have also suggested that peremptory challenges originally were "actually a kind of shorthand challenge for cause in small English villages and towns, where it was commonplace for . . . cause disqualifications to be obvious to all." Pizzi & Hoffman, *supra*, at 1412. In either case, "peremptory challenges antedated the notion of jury impartiality by some 200 years . . . ." *Id.* at 1439. Although the need to offset royal infallibility eventually became outdated, the practice of allowing litigants in each case a limited number of peremptory challenges remained a long standing tradition in England that eventually

was adopted in the United States without much debate or fanfare. *See* Hoffman,

*supra,* at 823-25.[3]

The peremptory challenge was adopted in the Washington Territory shortly

after the territory's formation, without any record of substantive debate on the topic.

The first legislature of the territory passed comprehensive codes of civil and criminal

procedure, both of which provided for the use of peremptory challenges among

myriad other procedural matters. *See* LAWS OF 1854, at 100-29, 129-221; *see also id.*

at 118, 165. The legislative journals reveal that these comprehensive procedural

codes were discussed primarily in legislative committees; both codes were passed

swiftly, with only "sundry amendments" made during the legislative process. *See*

HOUSE JOURNAL,1st Sess., at 71, 73, 77-78, 80 (Wash. Terr. 1854); COUNCIL

JOURNAL, 1st Sess., at 134-35, 137, 149, 150-51, 153, 160 (Wash. Terr. 1854). There

is no record of any debate or deliberations regarding peremptory challenges. At the

---

[3] Although the peremptory challenge became a long standing tradition in England, the practice was eventually abolished in that country in 1988. *See, e.g.,* Nancy S. Marder, *Two Weeks at the Old Bailey: Jury Lessons from England,* 86 CHI.-KENT L. REV. 537, 553 & n.50 (2011) ("England had the peremptory and eliminated it, and does not seem any worse off for having eliminated it." (footnote omitted) (citing Criminal Justice Act, 1988, ch. 33, § 188(1) (Eng.)). The comparison is informative, but it is admittedly imperfect because the English jury system does not strictly require jury unanimity for a guilty verdict. *See id.* at 579-80 ("After the jury has deliberated for at least two hours and has reported to the judge that it is having difficulty reaching a unanimous verdict, the judge can decide to accept a [super-majority] verdict . . . if there is a vote of 11-1 or 10-2."). English prosecutors may also use a "standby" procedure that is in effect similar to a peremptory challenge, but prosecutors rarely exercise standbys. Nancy S. Marder, *Beyond Gender: Peremptory Challenges and the Roles of the Jury,* 73 TEX. L. REV. 1041, 1102-03 & n.262 (1995).

time, racial minorities and women were completely excluded from participation on

juries. *See* Forman, *supra,* at 910; Aaron H. Caplan, *The History of Women's Jury*

*Service in Washington, in* WASH. ST. B. NEWS, Mar. 2005, at 13.

The original code provisions from the Washington Territory governing the use

of peremptory challenges have remained essentially unchanged and unquestioned

from the time they were adopted until now. These procedural provisions were still in

place when Washington became a state, at which point they were ostensibly adopted

by our state constitution as part of a broad incorporation of territorial laws in force at

the time. *See* CONST. art. XXVII, § 2. The sole substantive alteration to these

provisions came in 1969 and related to the number of peremptory challenges available

to multiple parties on the same side of a case. *See* LAWS OF 1969, 1st Ex. Sess., ch.

37, § 1, ch. 41, § 1. There is no record of any related discussion or debate concerning

the wisdom of maintaining the peremptory system generally. *See, e.g.,* HOUSE

JOURNAL, 41st Leg., Reg. Sess.,at 162-63 (Wash. 1969) (debate concerned equal

distribution of challenges among parties and extent of judicial review).

In 1973, this court adopted its first set of comprehensive criminal court rules,

including a provision allowing for the exercise of peremptory challenges. *See* former

CrR 6.4(a) (1973). The Criminal Rules Task Force, which originally drafted and

recommended the rules for adoption, provided substantial commentary and

explanation regarding many of its proposed rules. *See generally* CRIMINAL RULES

TASK FORCE, WASHINGTON PROPOSED RULES OF CRIMINAL PROCEDURE (May 15,

1971). Regarding the sole provision allowing for the continued use of peremptory challenges, however, the task force simply cited to the relevant preexisting statutes, without further discussion. *See id.* at 102. Thus, the use of peremptory challenges in this state was allowed to continue, but once again, without substantive debate or discussion concerning the propriety of the procedure.

It is time to consider whether peremptory challenges actually should be part of our jury selection process.

### 6. *The Need To Abolish: Preventing Constitutional Violations*

Peremptory challenges must be abolished in order to put an end to the racial discrimination that underlies their use throughout this state. The exercise of a peremptory challenge based on race violates the constitutional requirement of equal protection of laws. *See, e.g., Powers,* 499 U.S. at 409. Specifically, a defendant has "the right to be tried by a jury whose members are selected by nondiscriminatory criteria," *id.* at 404, and a prospective juror has "the right not to be excluded from [a jury] on account of race," *id.* at 409. Peremptory challenges based on race directly violate these constitutional rights.

As already discussed, judicial review of individual peremptory challenges is ineffective and cannot address the ongoing constitutional violations occurring throughout this state. Because this court has plenary authority over trial procedures, we should abolish peremptory challenges in order to deter those violations.

Abolishing peremptory challenges is constitutionally required, given the need to prevent racial discrimination and the lack of any justification for allowing peremptory challenges. When a given policy creates a systematic risk of racial discrimination, the "question is at what point that risk becomes constitutionally unacceptable." *Turner v. Murray,* 476 U.S. 28, 36 n.8, 106 S. Ct. 1683, 90 L. Ed. 2d (1986); *McCleskey v. Kemp,* 481 U.S. 279, 308-09, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). The point at which such a risk becomes constitutionally unacceptable obviously depends upon the ostensible justifications and need for the given policy or practice. *Compare McCleskey,* 481 U.S. at 311, 313 (risk that some juries were discriminating in capital sentencing held constitutionally acceptable because of the importance of trial by jury, the need to maintain discretion in the criminal justice system, and the presence of safeguards), *with United States v. Jackson,* 390 U.S. 570, 581-83, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968) (policy held unconstitutional, regardless of intent, because it posed risk of chilling the exercise of basic constitutional rights and did so "needlessly"). In this case, the policy of allowing peremptory challenges creates a substantial risk of racial discrimination, has the "inevitable effect" of excluding some citizens from jury service on the basis of race, and has *no* substantiated benefits. *Jackson,* 390 U.S. at 581. There is simply no need for litigants to be able to exclude prospective jurors without reason. But we need not even decide whether the policy of allowing peremptory challenges is unconstitutional

54

in itself because our plenary authority in this area already obliges us to abolish

peremptory challenges in pursuit of justice.

### 7. *The Need To Abolish: Preventing Other Injustices*

In addition to the need to prevent racial discrimination, this court must abolish

peremptory challenges in order to eliminate all of the other substantial costs the

practice imposes upon our justice system. The disproportionate exclusion of minority

groups from jury service, for example, is of great concern. Jury participation is

critically important to the functioning and legitimacy of our government. The use of

juries validates the justice system through community participation, provides a check

against governmental abuses of power, educates citizens and promotes civic

engagement, and promotes integration and mutual understanding across social groups.

*See Powers*, 499 U.S. at 406-07; Taslitz, *supra*, at 1685, 1687, 1698, 1700, 1709-10

("A racially diverse jury . . . will [] humble criminal-justice-system leaders and their

agents before subordinate group members, who are treated for the moment as full and

equal members of the People. In this way, [inclusion] amplifies the egalitarian effects

of ocular justice."). All of these purposes are substantially thwarted when minority

groups are disproportionately excluded from jury service. Members of excluded

groups also can be emotionally harmed, and the appearance of fairness is considerably

eroded. *See supra* p. 48. The elimination of peremptory challenges is also needed to

reduce wasteful administrative and litigation costs, to promote more effective juries,

and to prevent the amplification of resource disparity in jury selection. *See supra* pp. 40-42. To further all of these purposes, we must abolish peremptory challenges.

## 8. *Going Forward*

Abolishing peremptory challenges will bring us only one step closer to justice. As a general matter, we must continue to oversee the rules of procedure in this state, ensure that such rules are fair and effective, and see that justice is done in each and every case within our jurisdiction. If we finally abolish peremptory challenges and thus resolve the myriad problems associated that procedure, we should then turn our attention to whether our overarching framework of causal challenges needs improvement or clarification. We should also engage in our formal rule-making process in order to consider additional proposals for improving jury selection, including ways to further the goals of inclusion and diversity.

But we should not leave the current system in place while trying to devise such solutions. The use of peremptory challenges in our legal system has never been shown to be beneficial in any way. In stark contrast, the grave problems the practice causes are ongoing, before us, and must be addressed. Such grave problems will continue even if we begin a formal attempt to devise a better solution. Further, a better solution is highly unlikely to ever appear; numerous alternatives to abolishing peremptory challenges already have been proposed, but none appear promising. *See, e.g.*, Jean Montoya, *The Future of the Post-*Batson *Peremptory Challenge: Voir Dire by Questionnaire and the "Blind" Peremptory*, 29 U. MICH. J.L. REFORM 981 (1996)

(proposing entirely written voir dire and peremptory challenges); Jeb C. Griebat, *Peremptory Challenge by Blind Questionnaire: The Most Practical Solution for Ending the Problem of Racial and Gender Discrimination in Kansas Courts While Preserving the Necessary Function of the Peremptory Challenge*, 12 KAN. J.L. & PUB. POL'Y 323 (2003) (proposing written questionnaires and peremptory challenges prior to live voir dire); Brian W. Stoltz, *Rethinking the Peremptory Challenge: Letting Lawyers Enforce the Principles of* Batson, 85 TEX. L. REV. 1031, 1034, 1047 (2007) (proposing a convoluted "peremptory block system"). Even if we do eventually identify and adopt a better solution, the current system simply cannot stand and thus, should not be maintained in the meantime.

If we do not abolish peremptory challenges, we should at least take steps to augment the effectiveness of the current jury selection process under *Batson*. For example, we could require trial courts to conduct questioning directly and to impose a strict relevance requirement for any questions submitted by the attorneys, with an exception for special circumstances or when the trial judge has established her or his own declared rules to govern the relevant interests at stake. *Cf. State v. Roberts*, 142 Wn.2d 471, 519, 14 P.3d 713 (2000) (litigants not entitled to conduct "their own voir dire of every prospective juror"); STARR & MCCORMICK, *supra*, at 2-21 ("In federal cases, 70 percent of voir dire is conducted by judges."). There are numerous costs and benefits associated with greater control and questioning by trial judges, *see, e.g.,* GOBERT & JORDAN, *supra*, at 326-27; STARR & MCCORMICK, *supra*, at 19-4, but

greater control will at least limit the ability of attorneys to go fishing for pretextual race-neutral reasons and will also generally limit the availability of such reasons and properly shift the focus to causal as opposed to peremptory challenges. That said, limiting available information might also promote the greater use of stereotypes and generalizations—underscoring once again the need to eliminate peremptory challenges entirely.

In sum, the need to abolish peremptory challenges is abundantly clear.

## III. APPLICATION

Although the allowance of peremptory challenges at Saintcalle's trial should be considered trial error, Saintcalle himself is not entitled to reversal of his conviction. Because trial courts throughout this state have been allowing peremptory challenges in good faith until now, and because a peremptory challenge is only a small part of the entire trial process and is not innately harmful or pernicious, the erroneous allowance of a peremptory challenge does not warrant reversal in every case. *See Creech,* 44 Wash. at 73-74; *Rivera,* 556 U.S. at 157; *cf. N. Pac. Ry. v. Herbert,* 116 U.S. 642, 646, 6 S. Ct. 590, 29 L. Ed. 755 (1886) (erroneous allowance of causal challenge held harmless); *State v. Larkin,* 130 Wash. 531, 533, 228 P. 289 (1924) (same); *State v. Williams,* 132 Wash. 40, 46, 231 P. 21 (1924) (same). Reversal is warranted on appeal only if the trial court (1) acted in bad faith in failing to follow the law or (2) allowed a peremptory challenge in good faith but failed to comply with the *Batson* framework.

In Saintcalle's case, the trial court acted in good faith and did not commit clear error in allowing the peremptory challenge of prospective juror Tolson. First, the trial court clearly acted in good faith because at the time of Saintcalle's trial, peremptory challenges were allowed under the law. Second, the record does not compel a finding that the prosecutor's challenge of prospective juror Tolson was racially discriminatory. The record discloses that the parties obtained written questionnaires from the prospective jurors prior to voir dire and that the written responses contained substantive information. *See* Verbatim Report of Proceedings (VRP) (Mar. 10, 2009) at 119. The record also reveals that the prosecutor was aware of certain facts about Ms. Tolson that were not divulged during voir dire—including some facts related to the recent death of her friend. *See* Transcript of Proceedings (TP) (Mar. 9, 2009) at 66, 68; VRP at 101-02. If Ms. Tolson revealed in her questionnaire that her friend had recently been murdered, that would reasonably explain why she was questioned extensively. And once thoroughly questioned, Ms. Tolson expressed serious doubts about her ability to serve on the jury—doubts that were far more substantial than those of any other juror. *See* TP at 70 ("I like to think that I am fair and can listen . . . but I don't know. I have never been on a murder trial and have just lost a friend two weeks prior to a murder."); VRP at 43 ("I don't know how I'm going to react. . . . [A]s we go through it, and I hear the testimony, and I see the pictures, I don't know."). Unfortunately, the questionnaires were not made part of the record. With that material omission in mind, we must affirm the trial court's decision because the

59

burden of proof is on Saintcalle and the record "fails to affirmatively establish an abuse of discretion." *Sisouvanh,* 175 Wn.2d at 619 (citation omitted).

The trial court did subsequently find that the prosecutor attempted to strike a different prospective juror based on race, which the trial court should have considered as relevant to the previous challenge against Ms. Tolson. However, Saintcalle did not ask the trial court to reconsider its prior ruling. Further, even keeping in mind the prosecutor's subsequent racial discrimination, it still was not clear error for the trial court to find that the earlier challenge to Ms. Tolson was race-neutral.

Based on a review of the record, I cannot say that the trial court clearly erred in allowing the prosecutor's peremptory challenge and excusing Ms. Tolson from the jury. Applying the appropriate legal framework to this case—that is, reviewing the allowance of a peremptory challenge as error, subject to reversal only in cases involving bad faith or failure to comply with *Batson*—Saintcalle is not entitled to reversal of his conviction.

## IV.   CONCLUSION

The time has come to abolish peremptory challenges. The use of this procedure propagates racial discrimination, contributes to the historical and ongoing underrepresentation of minority groups on juries, imposes needless administrative and litigation costs, results in less effective juries, amplifies resource disparity in jury selection, and mars the appearance of fairness in our justice system. It provides no material benefits.

The compelling need to abolish peremptory challenges is no secret. Numerous jurists throughout the nation repeatedly have recognized the need to eliminate this "anathema to our democracy." Broderick, *supra*, at 371; Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection*, 4 HARV. L. & POL'Y REV. 149, 166 (2010) (N.D. Iowa); *Rice v. Collins*, 546 U.S. 333, 342, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (Breyer and Souter, JJ., concurring); *Morgan v. Commonwealth*, 189 S.W.3d 99, 115 (Ky. 2006) (Graves, J., concurring), *overruled on other grounds by Shane v. Com.*, 243 S.W.3d 336 (Ky. 2007); John Paul Stevens, *Foreword*, 78 CHI.-KENT L. REV. 907 (2003) (U.S.); *Commonwealth v. Maldonado*, 439 Mass. 460, 468, 788 N.E.2d 968 (2003) (Marshall, C.J., Greaney and Spina, JJ., concurring); *Wamget v. State*, 67 S.W.3d 851, 860 (Tex. Crim. App. 2001) (Meyers, J., concurring); *State v. Buggs*, 581 N.W.2d 329, 343 (Minn. 1998) (Page, J., dissenting); *Minetos v. City Univ. of New York*, 925 F. Supp. 177, 183 (S.D.N.Y. 1996); Hoffman, *supra* ; *Parker v. State*, 219 Ga. App. 361, 364, 464 S.E.2d 910 (1995) (Pope, J., concurring); *Thorson v. State*, 653 So. 2d 876, 896 (Miss. 1994) (Sullivan, Pittman, and Banks, JJ., concurring); *Gilchrist v. State*, 97 Md. App. 55, 78, 627 A.2d 44 (1993) (Wilner, C.J., concurring); *People v. Bolling*, 79 N.Y.2d 317, 325, 591 N.E.2d 1136 (1992) (Bellacosa, J., Wachtler, C.J., and Titone, J., concurring); *Alen v. State*, 596 So. 2d 1083, 1086 (Fla. Dist. Ct. App. 1992) (Hubbart, J., concurring); Theodore McMillian & Christopher J. Petrini, *Batson v. Kentucky: A Promise Unfulfilled*, 58 UMKC L. REV. 361, 374 (1990); *State v. Johnson*, 722

S.W.2d 62, 66 (Mo. 1986) (Donnelly, J., concurring); *Batson*, 476 U.S. at 102

(Marshall, J., concurring).

At the same time, no jurisdiction in the United States has been willing to be the

first to take the necessary step of abolishing peremptory challenges. *See Flowers*, 947

So. 2d at 938 (Miss. 2007). But mere idle threats will not curb any of the myriad

problems associated with peremptory challenges—problems which are ongoing and

significant. *Cf. id.* at 939 ("While we neither abolish peremptory challenges, nor

adopt a limited voir dire rule, nor make any specific changes to our peremptory

challenge system, we are inclined to consider such options if the attorneys of this

State persist in violating the principles of *Batson* by racially profiling jurors."). The

same can be said of "wait[ing] for another case" or some future better rule to come as

the court does here. Lead opinion at 24; concurrence (Madsen, C.J., joined by J.M.

Johnson, J.) at 1, 3; concurrence (Stephens, J., joined by C. Johnson and Fairhurst, JJ.)

at 1, 5. It appears true that "overcoming negative sentiment among judicial actors

might present the biggest hurdle to implementation of this proposed reform." Maisa

Jean Frank, *Challenging Peremptories: Suggested Reforms to the Jury Selection*

*Process Using Minnesota as a Case Study*, 94 MINN. L. REV. 2075, 2101 (2010). This

court should not be blinded by tradition, *see J.E.B.*, 511 U.S. at 142 n.15, and must

recognize that "a single courageous state" is always first to act, *New State Ice Co. v.*

*Liebmann*, 285 U.S. 262, 311, 52 S. Ct. 371, 76 L. Ed. 747 (1932) (Brandeis, J.,

dissenting). The time has come for Washington to finally abolish the peremptory

challenge.

_Gonzáles, J._

*State v. Saintcalle (Kirk Ricardo)*

No. 86257-5

CHAMBERS, J.* (dissenting) — *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), was a great, symbolic step forward in providing equal justice under law. But *Batson,* sadly, has remained primarily symbolic. In practice, *Batson* merely requires the machinery of justice pause, consider whether a preemptory challenge was racially motivated, find a plausible sounding, nondiscriminatory reason to dismiss a juror, and move on. *Batson* was doomed from the beginning because it requires one elected person to find that another elected person (or one representing an elected person) acted with a discriminatory purpose. This has proved to be an impossible barrier. Further, *Batson,* by design, does nothing to police jury selection against unconscious racism or wider discriminatory impacts. I am skeptical—given that we have never reversed a verdict on a *Batson* challenge—that it does much to police discriminatory purpose itself.

*Batson* ignores the fact that discrimination is discrimination whether it is purposeful or not. It ignores the fact that discrimination is real whether it is done with racist intent or not. It ignores the fact that the minority juror who is removed because of discrimination is denied the right to participate in one of the two most fundamental democratic processes of our nation. We have learned something from history, and this case gives us an opportunity to show it.

*Justice Tom Chambers is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

I believe Justice Alexander was right in *State v. Rhone*, 168 Wn.2d 645, 229 P.3d 752 (2010). Following his dissent, I would hold that a prima facie case of discrimination is established when the sole remaining venire member of a constitutional cognizable racial group is peremptorily challenged. *Id.* at 661 (Alexander, J., dissenting). I would do this, not under *Batson,* but under our inherent supervisory power and based on our own understanding of the pernicious effect of unconscious racism on a fair system of justice. *See State v. Bennett,* 161 Wn.2d 303, 305, 165 P.3d 1241 (2007); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 149 Wn.2d 660, 674-75, 72 P.3d 151 (2003) (citing *State ex rel. Citizens Against Mandatory Bussing v. Brooks*, 80 Wn.2d 121, 128-29, 492 P.2d 536 (1972) (finding the difference between de facto and de jure discrimination constitutionally insignificant), *overruled on other grounds by Cole v. Webster*, 103 Wn.2d 280, 288, 692 P.2d 799 (1984))).

I do not believe it would be wise of this court to abandon peremptory challenges altogether. Peremptory challenges are important in ensuring fair trials because jurors are sometimes not candid or fail to understand they have deep seated prejudices that may not be easily developed during voir dire to support a for-cause challenge.

In this case, I am simply not convinced that Kirk Saintcalle received a fair trial before a truly representative jury. I would reverse and remand for a new trial.

I respectfully dissent.

Chambers, J.